VICTOR BEDNARIK, petitioner,

*v.*

DOROTHY BEDNARIK, defendant.

[Decided October 15th, 1940.]

*Mr. Augustus C. Nash,* for the petitioner.

*Mr. Jerome J. Sonnabend,* for the defendant.

*Mr. Israel B. Greene, amicus curiæ.*

HERR, A. M.

Petitioner's petition for divorce against defendant on the ground of adultery has been met by an answer denying his charges and by a counter-claim seeking a decree of divorce against him. Petitioner alleges that a child born to defendant on August 27th, 1938, is not his child. This charge is specifically denied by the answer. Petitioner's present application, made before reference under rule 128e, is based upon an affidavit in which he says: "As the parentage of said child is involved in this suit I feel that it is absolutely essential to the trial of the same, that one or more blood grouping tests be made of myself, wife and said child in order to determine the parentage."

The blood grouping tests to which petitioner seeks to subject defendant and the child, together with himself, in an effort to prove that he is not the father of the child, are of comparatively recent development. According to medical authority, hereditary characteristics are determined by units called "genes" which are said to occur in pairs in rod-like chromosomes of the nuclei cells. The human blood groups follow the chromosome theory. The blood groups, of which there are four, are predetermined by the presence or absence in the chromosomes of two genes called "A" and "B." Absence of both "A" and "B" is indicated by "O." Because each somatic cell possesses two of these genes (one from each parent) there are six possible genetic formulæ, "OO," "AA," "AO," "BB," "BO" and "AB." However, since the blood of an "AO" individual is routinely indistinguishable from that of an "AA" individual, and since similarly "BO" blood is routinely indistinguishable from "BB" blood, we have only four demonstrable types of blood (the phenotypes) namely "O," "A," "B" and "AB." There is a wealth of literature

on this subject, some of the authorities being gathered in the footnote below.*

It is said that the requisite series of blood grouping tests cannot identify a person as the parent of a child, but may eliminate such person as a possible parent. The tests will either answer "no," or give no answer at all. For example, if a man is charged with being the father of a certain child, and if the tests show that his blood belongs to group A, the mother's to group AB, and the child's to group B, the possibility of his being the father of the child is eliminated, and his innocence of the charge established. On the other hand, if the tests show that his blood belongs to group O, the mother's to group AB, and the child's to group A, he is not excluded, although the tests in that case will not constitute proof that he is in fact the child's father. According to the authenticated records it is now possible by these blood grouping tests to detect approximately thirty per cent. of all false accusations of paternity.

We have no reported cases in New Jersey in which blood grouping tests have been ordered by the court, for any purpose. But there are decisions in other jurisdictions which should be noted.

The first reported case involving such blood grouping tests seems to be *Commonwealth* v. *Zammarelli* (*1931*), *17 Pa. D. & C. 229*. There the prosecutrix, an unmarried girl, obtained an indictment against the defendant for fornication and bastardy. In defense, the defendant produced a patholo-

---

* Wiener, Blood Groups and Blood Transfusion (1935); Wiener, Determining Parentage, Scientific Monthly, April, 1935, page 323; Blood Test for Determination of Fatherhood, J. Am. Med. Assn., page 1057 (March 31st, 1928); Schiff, Medico-Legal Significance of Blood Groups, The Lancet, page 921 (November 2d, 1929); Blood Tests for Paternity, J. Am. Med. Assn., page 681, (August 20th, 1930); Lattes, Individuality of the Blood (Rev. Ed. 1932); Swetlow, Symposium of the Forensic Value of Tests for Blood Groupings, Med. Times and Long Island Med. J., page 203 (July, 1932); Pepper and Farley, Practical Hematological Diagnosis (1934), pages 195, *et seq.*; Landsteiner, Forensic Application of Serologic Individuality Tests, J. Am. Med. Assn., page 1041 (October 6th, 1934); Hooker and Boyd, Blood Grouping As a Test of Non-Paternity, 25 J. Crim. L. 187 (1934); Wigmore, Evidence (Supp. 1934), sections 165a, 165b, pages 149-160.

gist who made blood tests and testified that the defendant could not possibly have been the father of the prosecutrix' child, because the defendant was type "O," the mother type "A" and the child type "B." Apparently disregarding this evidence, the jury found the defendant guilty, and the verdict was upheld by the trial court. On appeal, the county court reversed the decision and granted a new trial because of the contrary uncontroverted expert testimony based upon the blood grouping tests. But in *Commonwealth* v. *Morris* (*1934*), *22 Pa. D. & C. 111*, a similar case, the court denied an application to compel the prosecutrix to submit to a blood grouping test because of lack of legislative authority.

*Commonwealth* v. *Visocki* (*1935*), *23 Pa. D. & C. 103*, was in keeping with the final result in the *Zammarelli Case*. This was an action for desertion and non-support of a wife and minor child. The wife was twenty years old, the husband forty-two, and the child was born in wedlock approximately seven months after the marriage. The husband claimed that he had never had sexual intercourse with his wife because he had heard on the evening of their marriage that she was pregnant. Two physicians called by the defendant testified that they had made blood grouping tests of him, the mother, and child and that it was impossible for the defendant to be the father of the child. The case was dismissed.

In *Commonwealth* v. *English* (*1936*), *123 Pa. Super. 161; 186 Atl. Rep. 298,* the defendant was prosecuted for fornication and bastardy. The defendant's application for an order directing prosecutrix to submit herself and her child to blood grouping tests was denied. On appeal, the court's action was affirmed, as not an abuse of discretion, the court saying:

"While * * * such an operation is not regarded as entailing any serious danger to the health of the patient, it cannot be said that there is no danger for there is always some risk of infection. Until the legislature finds that blood grouping tests have attained such scientific standing as to possess probative value as to paternity * * * the courts have not the power in a criminal case such as this to compel the prosecutrix or other witness to submit her body for blood tests."

In *State* v. *Welling* (*1936*), *6 Ohio Op. 371,* a bastardy

proceeding, an application by defendant for the making of blood grouping tests was granted.

In the recent case of *State* v. *Wright* (*1938*), *150 Ohio App. 191; 17 N. E. Rep.* (*2d*) *428,* the prosecutrix, an unmarried female, charged the defendant with being the father of her unborn child. After the birth of the child the case came on for trial. Blood grouping tests were made of the mother, child and putative father. The state excepted to the admission of this evidence. The witness testified on the basis of the tests made that the defendant could not possibly be the father of the child. Nevertheless the jury gave a verdict of "guilty." A new trial was granted. The Court of Appeals for Franklin county held that there was no error in admitting the evidence under such safeguards as should surround the testimony of every expert witness, and that there was no abuse of discretion in setting aside the verdict, which in the judgment of the trial court was against the weight of the evidence.

In *State* v. *Damm* (*S. D.*), *266 N. W. Rep. 667,* the court said:

"It is our considered opinion that the reliability of the blood test is definitely and, indeed, unanimously established as a matter of expert scientific opinion entertained by authorities in the field."

In *Beuschel* v. *Manowitz* (*1934*), *272 N. Y. S. 165,* which was an action for damages for carnal assault, Steinbrink, J., granted an order for the taking of blood grouping tests, acting under section 306 of the Civil Practice act. On appeal, the order was reversed, the court saying:

"Plaintiff may submit or not to the taking of her own blood, but it plainly determines nothing. She asserts, and no one would gainsay it, that she is the mother of the child."

The appellate court held that section 306 of the Practice act did not apply to such a cause of action. But in 1935 the New York statute was amended so as to confer jurisdiction in similar cases where definite exclusion is established. See *In re Swahn's Will* (*1936*), *285 N. Y. S. 234; 158 Misc. 17.*

In *Arais* v. *Kalensnikoff,* a case heard by the Superior Court of Los Angeles, the defendant, a Russian seventy years

of age, was charged by plaintiff, a Spanish woman, with being the father of her illegitimate daughter. Mrs. Arais testified that she had been married twice, that she was separated from her second husband, and that since the time of that separation she had not had sexual relations with any man other than the defendant. The defendant denied ever having had sexual relations with the plaintiff, and both he and his wife testified that he had been impotent for a number of years. At defendant's request and with plaintiff's consent blood grouping tests were made of the plaintiff, her daughter and the defendant. According to the tests, both plaintiff and defendant belonged to group "O" and the child to group "B." According to such grouping it was impossible for the defendant to have been the father of this child, but in spite of this evidence from an eminent physician the trial court found that the defendant was the father of the plaintiff's child. On May 5th, 1937, the District Court of Appeals, Second Appellate District, reversed the trial court. *Arais* v. *Kalensnikoff* *(1937)*, *89 Calif. Dec. 537;* *67 Pac. Rep. (2d) 1059.* In his opinion, Judge McComb said:

"In passing, our research discloses that the blood grouping test requires only a few drops of blood, is painless, and in no way prejudicial to health."

But the Supreme Court, on appeal, upheld the action of the trial court and handed down an opinion holding that "there is ample evidence to support the finding of parentage." *95 Cal. Dec. 4, 9; 74 Pac. Rep. (2d) 1043, 1047.* Rehearing denied, *95 Cal. Dec. 45.*

The law in this country on the subject of blood grouping tests, as evidenced by the reported adjudications, has not been developed comparably with that in some of the European jurisdictions. See remarks of Wingate, Surrogate, *In re Swahn's Will, supra.* All of the law review articles and medico-legal literature on the subject seem to favor the use of the blood tests, and to take the view that these tests are fully accredited and entitled to great if not conclusive evidential force. But because of their comparative novelty many courts have shown reluctance to accept the results of such tests as reliable evidence, just as in the case of every new

scientific discovery. "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stage is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye v. U. S., 54 App. D. C. 46; 293 Fed. Rep. 1013; 34 A. L. R. 145;* see *86 A. L. R. 616.*

It may be remarked incidentally that our courts have shown a liberal and progressive attitude toward the introduction in evidence of scientific discoveries as an aid to the ascertainment of the truth. For example, in *State v. Cerciello, 86 N. J. Law 309; 90 Atl. Rep. 1112,* our Court of Errors and Appeals, in speaking of the admissibility of evidence of fingerprints, said:

"In principle its admission as legal evidence is based upon the theory that the evolution in practical affairs of life, whereby the progressive and scientific tendencies of the age are manifest in every other department of human endeavor, cannot be ignored in legal procedure, but that the law in its efforts to enforce justice by demonstrating a fact in issue, will allow evidence of those scientific processes, which are the work of educated and skillful men in their various departments and apply them to the demonstration of a fact, leaving the weight and effect to be given to the effort and its results entirely to the consideration of the jury. *Stephen Dig. Ev. 267; 2 Best. Ev. 514.*"

Petitioner's application, therefore, should not be denied merely because there have been no precedents in this state in which such applications have been granted. Yet a number of reasons present themselves *in limine* why the application should not be granted, at least prior to final hearing. Some are mentioned by Advisory Master Van Winkle in *Gattoni v. Gattoni, 17 N. J. Mis. R. 245; 8 Atl. Rep. (2d) 277.* See, also, the unpublished opinion of Walker, V. C., in *Butler v. Butler, Dk. 27 p. 746.* The rule is stated in *9 R. C. L. 174 § 13,* as follows:

"A court will not interfere in this way to enable a party to search out evidence or witnesses, or, as it is sometimes expressed, the remedy by discovery or interrogatories will not be permitted * * * for fishing purposes."

See note *58 A. L. R. 1263.*

In my judgment, however, it would serve no useful purpose to deny petitioner's application upon technical grounds, since no doubt he would renew it upon the final hearing, so that it seems best to deal with it on the merits at this time.

Petitioner bases his motion upon the 1939 statute, *R. S. Cum. Supp. 2:101-3 (N. J. S. A. 2:99-4)*, which is the second of two sections comprising chapter 221 of the laws of 1939, entitled "An act concerning evidence and witnesses, and supplementing subtitle 11 of title 2 of the Revised Statutes." *N. J. S. S. 1940 pp. 86, 87.*

The parties have stipulated that the medical data heretofore referred to in the footnote shall be considered and taken to be sufficient factual proof of the validity and evidential value of the blood grouping tests. I doubt if such a stipulation ought to be accepted as a basis for ordering such tests to be made (assuming that there were no constitutional or legal objections thereto) in view of the equivocal sanction accorded by the legislature, as hereinafter noted, and of the complete absence of judicial consideration in New Jersey as to the probative value of such evidence. However, since the petitioner's application is hereby denied upon the constitutional and legal grounds hereinafter set forth the stipulation may safely be accepted for the purposes of the motion.

The statute reads as follows:

"1. Whenever it is relevant to the cause of the prosecution or the defense in a proceeding involving parentage of a child, the trial court, by order, may direct that the mother, her child and the defendant submit to one or more blood grouping tests to determine whether or not the defendant can be excluded from the probability of being the father of the child. The testimony of experts to the result of the test shall be receivable in evidence, but only in cases where definite exclusion of parentage of the defendant is indicated. The tests shall be made by duly qualified physicians, to be appointed by the court. Such experts shall be subject to cross-examination by both parties after the court has caused them to disclose their findings to the court or to the court and jury. Whenever the court orders such blood grouping

tests to be taken and one of the persons thus directed shall refuse to submit to such tests, such fact shall be disclosed upon the trial in the discretion of the court.

"2. Whenever it shall be relevant in a civil action to determine the parentage or the identity of any child or other person, the court, by order, may direct that any party to the action and the person whose parentage or identity is involved submit to one or more blood grouping tests, to be made by duly qualified physicians under such restrictions and directions as the court or judge shall deem proper. Whenever such test is ordered and made, the testimony of the experts to the results thereof, subject to cross-examination as in section one, shall be receivable in evidence, but only in cases where definite exclusion is indicated. The order for such blood grouping tests also may direct that the testimony of such experts and of the persons so to be examined be taken by deposition. The court shall determine how and by whom the costs of such examinations shall be paid.

"3. This act shall take effect immediately. Approved July 18th, 1939."

The statute may be taken to be a qualified legislative sanction for the use of blood grouping tests as possibly evidential of the fact of non-paternity where a positive reaction is secured, although the statutory phrase "to determine whether or not the defendant can be excluded from the *probability* of being the father of the child," contained in the first section, and the provisions in both sections to the effect that the ordering of the tests shall be entirely within the discretion of the court, would seem to indicate that the legislature intended that the courts should adjudicate as to whether such tests are of any probative value, and if so of what degree of probative value. Indeed, no legislation was needed to empower the courts to determine such questions.

So far as the second section of the statute is concerned, the only enlargement of the court's jurisdiction thereby granted seems to be the implied authorization to enforce an order for the tests to be made in spite of the refusal of a party or of a third person to undergo them. It will be noted that section 1, which undoubtedly applies to bastardy and filiation proceedings, provides for the making of blood grouping tests where relevant "to the case of the prosecution or the defense in a proceeding involving parentage of a child," and authorizes the court to order "that the mother, her child and the defendant submit to one or more blood grouping tests

to determine whether or not the defendant can be excluded from the probability of being the father of the child," and that the further provision of this section reads that "whenever the court orders such blood grouping tests to be taken and one of the persons thus directed shall refuse to submit to such tests, such fact shall be disclosed upon the trial in the discretion of the court." Section 2, under which the present application is made, provides for similar examination in a civil action "whenever it shall be relevant * * * to determine the parentage or the identity of any child or other person." Here the statute authorizes the court to "direct that any party to the action and the person whose parentage or identity is involved" submit to one or more blood grouping tests. There is no provision in this section as to what is to be done if the persons ordered to submit to the tests refuse to do so. The first section recognizes by implication the right of any person to decline to submit to the tests. It cannot reasonably be thought that the omission of a similar provision in the second section was accidental. The only tenable conclusion, it seems to me, is that the legislature by the first section was at pains not to infringe upon the privilege against ·self-incrimination or the constitutional right of personal privacy in criminal and *quasi*-criminal proceedings, but so far as civil proceedings are concerned recognized no such limitations in empowering the court *in proper cases* (that is, in cases where such immunities are outweighed by considerations of public policy) to make such an order and to enforce it by appropriate process. Authority to make an order implies authority to enforce it. *14 Am. Jur. tit. "Courts" 373 § 174.*

Examinations under order of this court to determine questions of impotency and the like are not made in the course of the common law and are not subject to resistance under constitutional privilege. *Union Pacific Railway Co.* v. *Clara L. Botsford, 141 U. S. 250; 35 L. Ed. 734.* But the court's jurisdiction to decree divorce is statutory, and its practice and procedure are subject to constitutional limitations. We are therefore confronted with the objection urged on behalf of defendant for herself and for the child that an order for

the making of blood grouping tests in this case would amount to an invasion of their natural and constitutional privileges.

The immunities which are thus urged are not confined to criminal cases. *Counselman* v. *Hitchcock, 142 U. S. 547; 35 L. Ed. 1110; Boyd* v. *United States, 116 U. S. 616; 29 L. Ed. 746; Marsh* v. *Marsh, 16 N. J. Eq. 391, 397.* In a suit for divorce on the ground of adultery the defendant cannot be forced to give evidence against himself except as to the fact of marriage. This was the law before the enactment of our statute, now *R. S. 2:97-9 (N. J. S. A. 2:97-9),* providing that "No husband or wife in any action or proceeding for divorce on account of adultery shall be compelled to give evidence for the other, except to prove the fact of marriage."

Whether a compulsory order for the taking of blood grouping tests is in violation of the privilege against self-incrimination has been debated elsewhere without any unanimity of opinion. The subject has been discussed in law review articles on the basis of analogical reasoning, but none of these articles have referred to any controlling decision. Out of the large mass of material published the following cases may be selected as indicating the divergence of judicial thought on the subject.

Perhaps the leading case is *State* v. *Height, 117 Iowa 650; 91 N. W. Rep. 935; 59 L. R. A. 437.* In that case the court had before it a closely related problem. The defendant was accused of statutory rape of a child ten years of age. In order to prove his guilt the state offered in evidence the testimony of a physician who had made a compulsory physical examination of the accused while in jail and against his will to determine whether he was afflicted with a venereal disease similar to that with which the prosecutrix had been infected. The court held that such an examination by a physician under the direction of the prosecutor constituted an unlawful search and seizure, a denial of the privilege against self-incrimination, and a violation of due process.

In *State* v. *Tonn, 195 Iowa 94; 191 N. W. Rep. 530,* the Iowa Supreme Court was faced with the decision in the *Height Case.* The question was whether incriminating literature obtained through an unlawful search and seizure was

admissible in evidence in a criminal prosecution. The majority opinion in the *Tonn Case* took the view that the true basis of the decision in the *Heighl Case* was that compelling a defendant to submit to a physical examination and requiring him to furnish evidence against himself was a denial of the privilege against self-incrimination.

While the varying constitutional and statutory provisions, both federal and state, secure in one form or another the privilege against self-incrimination, none of them define or interpret the meaning of the term self-incrimination. This has been left entirely to the courts. A substantial number of courts have given definitions broad enough to include compulsory blood grouping tests within the prohibition.

The following cases have cited or followed the *Height Case:* In *People* v. *McCoy (N. Y., 1873), 45 How. P. 216,* the defendant was charged with being the mother of a bastard child and of murdering it when born. While in jail, under arrest, upon order of the coroner, she was examined by two doctors. The testimony of these doctors that the accused had recently been delivered of a child was excluded as a denial of the privilege against self-incrimination; but in the later case of *People* v. *Sallow, 100 Misc. 447, 458; 165 N. Y. S. 915, 921,* the court said: "The rule of *People* v. *McCoy,* in so far as it held the evidence as to the condition discovered by compulsory physical examination of the defendant was not admissible in evidence, must be considered overruled." The opinion in *People* v. *Sallow, supra,* follows the view of the United States Supreme Court in *Holt* v. *United States, 218 U. S. 245; 54 L. Ed. 1021,* that the privilege against self-incrimination protects the defendant against extorting from him testimonial evidence, and does not apply to a physical examination.

The *Height Case* has exercised a strong influence on subsequent decisions. Three Missouri cases (*State* v. *Newcomb, 220 Mo. 254; 119 S. W. Rep. 405; State* v. *Horton, 247 Mo. 657; 153 S. W. Rep. 1051,* and *State* v. *Matsinger, 180 S. W. 856*) where the same issue was involved, reached a similar result, citing the *Heighl Case* in holding that the introduction of the medical testimony is a violation of the privilege against self-incrimination. In *Commonwealth* v.

*Valeroso, 273 Pa. 213; 116 Atl. Rep. 828, 830,* the court referred to the *Height Case* as containing an admirable discussion of the general question of the immunity from self-incrimination. The Arkansas court in *Bethel et al. v. State, 178 Ark. 277; 10 S. W. Rep. (2d) 370; 21 S. W. Rep. (2d) 176,* after considering the Missouri cases and quoting from that part of *State v. Newcomb, 220 Mo. 54, 66; 119 S. W. Rep. 405, 409,* which cites the *Height Case,* came to the same conclusion that a compulsory physical examination of a person accused of rape is inadmissible, as it is a denial of the privilege against self-incrimination. The majority opinion in the Michigan case of *People v. Corder, 224 Mich. 274; 221 N. W. Rep. 309,* followed the *Height Case* and carried it on to an extreme application.

A case closely analogous to the case at bar is *State v. Gatton (1938), 60 Ohio Appeals 192; 20 N. E. Rep. (2d) 265, Case No. 1043,* where the court was faced with the issue in its most direct form. The defendant was charged with operating a motor vehicle in the state of intoxication. After his arrest, request was made to him to submit to a blood test or urine analysis to determine the amount of alcohol in his system. This he refused to do, but the test was made. At the trial the evidence was admitted over the defendant's objection. In sustaining the trial court, the appellate court said:

"It will be observed in the instant case that the evidence offered was not required to be given by the defendant himself, but was given by the deputy sheriff and the doctor called by the deputy to make the examination of the defendant. We are unable to observe any merit in the defendant's claim that the introduction of such evidence violated his constitutional rights, and we believe, and hold, that the constitutional inhibition against self-incrimination relates only, as stated by Greenleaf, to disclosure by utterance. No such disclosure was required of the defendant in this case."

In the *Gatton Case* the court took a different view from that of the earlier Ohio case of *Booker v. Cincinnati, 5 Ohio Opin. 432,* in which the court held that the urine analysis test was in violation of the privilege and found that the privilege was not waived.

Perhaps the most recent case on the subject to date is the case of *State* v. *Duguid, 72 Pac. Rep. (2d) 435,* where evidence of a urine analysis taken after an arrest was admitted, showing that it contained two milligrams of ethyl alcohol per cubic centimeter and that such evidence was clear evidence of intoxication. (The defendant was charged with driving his automobile while intoxicated.) The jury returned a verdict of guilty and the trial court granted a new trial on the ground that the physician's testimony was a violation of the defendant's privilege against self-incrimination. Upon appeal, the Supreme Court reversed the trial court's ruling upon the ground that the accused had waived his protection under the privilege by consenting to the taking of the urine analysis. While the appellate court held that the defendant consented to the test, it nevertheless expressed doubt as to whether the constitutional provision against self-incrimination was applicable because it regarded the urinal analysis as *real evidence,* rather than *testimonial evidence.* The court quoted with approval the language of the Louisiana court in *State* v. *Graham, 116 La. 779, 782; 41 So. Rep. 91,* to the effect that the tendency of the more modern cases is to restrict the constitutional privilege against compulsory self-incrimination to confessions and admissions proceeding orally from the accused, and to open the door to all kinds of "real" evidence or proof of physical facts which speak for themselves.

In *State* v. *Cerciello, 86 N. J. Law 309; 90 Atl. Rep. 1112,* there is a statement that the police cannot lawfully fingerprint an accused person against his will. Mr. Justice Minturn, writing the opinion, said that *State* v. *Miller, 71 N. J. Law 528; 60 Atl. Rep. 202,* "is also authority for the proposition generally conceded by the trend of judicial authority, that the condition upon which such testimony is received is that so far as the defendant is concerned he shall not have involuntarily contributed to its production, so as to cause him in legal effect to serve as a witness against his will to furnish testimony to convict himself under the rule adopted in this state as part of the common law. *State* v. *Zdanowicz, 69 N. J. Law 619; 55 Atl. Rep. 743.* We do not find from an inspection of the testimony here, that this legal safeguard

was contravened in the case of this defendant." To the same effect, see *Underhill, "Criminal Evidence" 1133.* But in *Bartletta* v. *McFeeley, 107 N. J. Eq. 141; 152 Atl. Rep. 17; affirmed, 109 N. J. Eq. 241; 156 Atl. Rep. 658,* Vice-Chancellor Bigelow characterized the language of Mr. Justice Minturn in the *Cerciello Case* as *obiter dicta,* saying that "the passage quoted above does not establish the law as to fingerprinting. Neither the *Miller Case* nor the *Zdanowicz Case* is authority for the proposition that fingerprint evidence forcibly obtained is inadmissible." Although the Court of Errors and Appeals affirmed Vice-Chancellor Bigelow, his opinion was confined by the concurring opinion of Mr. Justice Parker, joined in by Mr. Justices Daly and Donges and Judge Kays. Pending the trial of the *Bartletta Case,* the so-called fingerprinting statute was passed, which has not as yet been considered by the Court of Errors and Appeals. In view of Mr. Justice Parker's concurring opinion, the New York cases of *Hawkins* v. *Kuhne, 137 N. Y. S. 1090; Gow* v. *Bingham, 107 N. Y. S. 1011,* and *People* v. *Hever, 215 N. Y. S. 412,* require serious consideration. And compare *United States* v. *Kelly (C. C. A., 2d Circuit), 55 Fed. Rep. 67.*

The decision in *Boyd* v. *United States, 116 U. S. 616; 29 L. Ed. 746,* which was written by Mr. Justice Bradley (formerly a justice of our New Jersey Supreme Court) is important for two reasons, first because it holds that the seizure or compulsory production of a man's private papers, to be used in evidence against him, is equivalent to compelling him to be a witness against himself, and secondly, because the opinion discusses the doctrine and practice of our Court of Chancery in granting discovery. Mr. Justice Bradley says (*29 L. Ed.,* at *p. 751*) :

"Now it is elementary knowledge that one cardinal rule of the Court of Chancery is never to decree a discovery which might tend to convict the party of a crime, or to forfeit his property. And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime or to forfeit his property, is contrary to the principles of a free government. It is

abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

In *Marsh* v. *Marsh, 16 N. J. Eq. 391,* which was an action for divorce on the ground of adultery, the Chancellor said :

"The bill prays a discovery from the defendant, whether, since her marriage, she hath not committed adultery with any person whatever, and with whom, and at what time and place, and under what circumstances. This constitutes a valid ground of demurrer. The rule is, that a defendant is not bound to accuse himself of a crime, *or to furnish any evidence* whatever which shall lead to any accusation of that nature. And the objection lies to a particular interrogatory, though the bill be in other respects unexceptionable. *Mitford's Eq. Pl. 194; Story Eq. Pl. §§ 522, 524, 575."* (Italics mine.)

See, also, *Story Eq. Pl. (9th Ed.) §§ 524, 525, 575-586.*

Professor Wigmore (*4 Wigmore on "Evidence" (2d Ed.)* §§ *2117, 2120, 2190, 2194*), *Britt ("Blood Grouping Tests and the Law; The Problem of Cultural Lag," 21 Minn. Law Review 671;* also *22 Minn. Law Review 836*), and *Mason Ladd and Robert B. Gilson (24 Iowa Law Review 191, "The Medico-Legal Aspects of Blood Tests to Determine Intoxication"*), take the view that blood tests and physical examination constitute *real* evidence not within the scope of the immunity against self-incrimination. Upon historical precedent they argue that the privilege against self-incrimination applies only to *testimonial* evidence. As against this view we have the leading case of *State* v. *Height, supra,* and the cases following it above mentioned.

The language of *R. S. 2:97-9 (N. J. S. A. 2:97-9)* expressly exempts a husband and wife in an action for divorce on the ground of adultery from being compelled to give "evidence" for the other, except to prove the fact of marriage. The comprehensive word "evidence" is used. Is there not a difference between giving evidence and being a witness (which implies testimonial evidence only) ? The word evidence is a broad, embracing term, including all classes of proof, testimonial or otherwise. The policy which moved the legislature

to confer the statutory privilege of immunity against giving *evidence* would seem to be the same whether the evidence is testimonial or otherwise.

In *22 C. J. 65,* it is said:

"In legal acceptation, the term 'evidence' includes all the means by which any alleged matter of fact, the truth of which is submitted to investigation, is established or disproved."

And in *22 C. J. 66,* it is said:

"While the term 'testimony' is frequently employed as equivalent, in legal effect, to 'evidence,' such use is inaccurate, for the two terms are not synonymous. 'Evidence' is the broader term and includes all testimony, but 'testimony' is accurately used to designate only a particular kind or species of evidence, namely, that which comes to the tribunal through living witnesses speaking under oath in the presence of the tribunal."

Bouvier says (*Rawle's Third Revision 1091*):

"The word evidence, in legal acceptation, includes all the means by which any alleged matter of fact, the truth of which is submitted to investigation, is established or disproved. *1 Greenl. Ev. C I § 1; Will, Cir. Ev. 1.* Testimony is not synonymous with evidence; *Harvey* v. *Smith, 17 Ind. 272;* the latter is the more comprehensive term; *Whart. Cr. L. § 783 * * *."

The provision of the Evidence act above cited (*R. S. 2:97-9; N. J. S. A. 2:97-9*) is in effect a re-enactment in comprehensive language of the common law immunity against self-incrimination, as it applies to suits for divorce on the ground of adultery. It preserves a principle so ancient and so universal that it ought to be held to be beyond question, at least until the legislature shall enact otherwise in clear and unequivocal language.

It is an established rule of statutory construction that repeals by implication are not favored and that where it is possible to reconcile two statutes the court should make every effort to sustain both. *Winne* v. *Casale, 99 N. J. L. 345; affirmed, 100 N. J. Law 291.* It cannot reasonably be held that the legislature, in authorizing the court to order the making of blood grouping tests, intended to repeal by implication a statute of such long standing, expressive of such an

ancient and universally approved personal privilege. *Bayonne Textile Corp.* v. *American Federation of Silk Workers, 116 N. J. Eq. 146; 172 Atl. Rep. 551.* Particularly such a construction should not be given to the statute where the result would be to render it to that extent unconstitutional, as it seems to me, because in violation of article 1, plac. 1, of our constitution.

It seems strange that in none of the reported cases has the constitutional right to personal privacy and security been raised and debated. This inherent right is expressly secured by all of the state constitutions, as well as by the Federal Constitution. The Constitution of New Jersey deals with it in article 1, plac. 1. The immunity "consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation." *16 C. J. S., Constitutional Law, art. 205.*

Under the English common law and under our American constitutional law, natural rights are such as appertain originally and essentially to each person as a human being, as a member of organized society and as a citizen of a free government. They are rights recognized as inherent in the individual member of the state, personal, absolute and inalienable. Among these rights is that of personal security. We have held this exemption to include the right of every person to be free from the scrutiny of others in respect to his private affairs, books and papers (*Ex parte Hague, 105 N. J. Eq. 134; 147 Atl. Rep. 220; affirmed, 123 N. J. Eq. 475, 480; 150 Atl. Rep. 322*), to be secure in his reputation against unwarranted attacks such as slanders and libels (*Neafie* v. *Hoboken Printing and Publishing Co., 75 N. J. Law 564; 68 Atl. Rep. 146*), and to be protected against the publication of his photograph without his consent. *Edison* v. *Edison Polyform Manufacturing Co., 73 N. J. Eq. 136; 67 Atl. Rep. 392;* see, also, *Pavesich* v. *New England Life Insurance Co.* (*Ga.*), *69 L. R. A. 101.*

The individual surrenders to society many rights and privileges which he would be free to exercise in a state of nature, in exchange for the benefits which he receives as a member of society. But he is not presumed to surrender all of those

rights, and the public has no more license, without his consent, to invade the domain of those reserved private rights than he himself has to violate the valid governmental regulations of the organized state of which he is a citizen. The right of privacy has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness to prove its existence. Any person of normal intellect recognizes at once that as to each individual member of society there are matters private, and matters public. Each individual instinctively resents any encroachment by the public upon his private rights. The right of privacy in matters purely private is derived from natural law. *1 Domat's Civil Law, by Strahan (Cushing's Ed.) 49; 1 Blk. Com. 123, 129, 134.* The concept was developed under the Roman law, whence it became incorporated into our common law. The *injuria* of the Roman law embraced not only all of those wrongs which were specifically enumerated by statute, but "by numberless other acts." *Sandars, Justinian (Hammond's Ed.) 499; Poste's Inst. of Gaius (3d ed.) 449.* The punishment of one who had not committed any assault upon another, or impeded in any way his right of locomotion, but who merely attracted public attention to the other as he was passing along a public highway or standing upon his private grounds, evidences the fact that the ancient law recognized that a person had a legal right "to be let alone," so long as he was not interfering with the rights of other individuals or of the public. This notion is the basis of our exercise of injunctive process in cases of private nuisances resulting from noise which interferes with one's enjoyment of his home. *2 Wood, Nuisances (3d ed.) 827 et seq.* Under the Roman law, to enter a man's house against his will, even to serve a summons, was regarded as an invasion of his right to privacy. *Hunter, Roman Law (3d ed.) 149.* This is the foundation of the common law maxim that "every man's house is his castle," and in *Semayne's Case, 5 Coke 91; 1 Smith's Lead. Cas. 228; 77 Eng. Reprint 194,* where this maxim was applied, one of the points resolved was "that the house of everyone is to him as his castle and fortress, as well for his defense against injury and violence as for his repose." The

reason for the punishment of eavesdroppers and common scolds was not for the protection of property rights, but the fact that their conduct was a disturbance of the right to quiet and repose. The right to search the person, papers or house of another for the purpose of enforcing a claim of one individual against another in a civil proceeding, or in the maintenance of a mere private right, was never recognized at common law, but such searches were confined entirely to cases of public prosecutions, and even in those cases the legality of the search was formerly doubted, and it has been said that it crept into the law by imperceptible degrees. *25 Am. & Eng. Encyc. L. (2d ed.) 145.* The refusal of the courts to allow such a search as an aid to the assertion of a mere private right, and its allowance sparingly to aid in maintaining the rights of the public, is a recognition of the existence of the constitutional right of privacy, for the law on the subject of unreasonable searches and seizures rests upon that principle.

To subject a person against his will to a blood test is an assault and battery, and clearly an invasion of his personal privacy. It involves the sticking of a surgical needle into his body. Perhaps the operation is harmless in the great majority of cases, although the risk of infection is always present. But if we admit such an encroachment upon the personal immunity of an individual where in principle can we stop? Suppose medical discovery in the future evolves a technique whereby the truth may infallibly be secured from a witness by trepaning his skull and testing the functions of the brain beneath. No one would contend that the witness could be forced against his will to undergo such a major operation at the imminent risk of his life, in order to secure evidence in a suit between private parties. How then can he be forced to undergo a less dangerous operation, and at what point shall the line be drawn? To my mind it is not the degree of risk of life, health or happiness which is the determinative factor, but the fact of the invasion of the constitutional right to personal privacy.

It may be conceded that a witness may be produced (including an infant) and viewed and inspected by the jury, to deter-

mine physical resemblance. *Gaunt* v. *State, 50 N. J. Law 490; 14 Atl. Rep. 600; Overseer of the Poor* v. *Eason, 92 N. J. Law 199, 201; 104 Atl. Rep. 291.* That is far different from subjecting an unwilling witness to an assault and battery to secure a blood grouping test. One's right of privacy is not legally infringed by requiring him to attend court as a witness. When in court he must necessarily undergo the visual scrutiny of the jurors. But it is a far step therefrom to subject the witness to a surgical examination against his will in aid of proof in an action between private persons in which the state has no interest.

This is not a case in which the public interest requires the making of the tests. Possibly there may be civil cases in which it could be argued that the tests could be justified under the police power, for example a proceeding for custody where a substitution has inadvertently been made in a maternity hospital. See *Buck* v. *Bell, 274 U. S. 200; 71 L. Ed. 1000.*

But upon what social theory can the compulsory blood grouping test of a defendant and her child in a divorce suit ordered for the purpose of attempting to prove her guilty of adultery, be justified? The public policy does not favor divorce. It regards the family as the social unit, and does not encourage the annulment or dissolution of that relationship. It recognizes, with the strongest presumption, the legitimacy of every child born in wedlock. *Vreeland* v. *Vreeland, 78 N. J. Eq. 256; 79 Atl. Rep. 336; Michaels* v. *Michaels, 91 N. J. Eq. 408; 110 Atl. Rep. 573; Thewlis' Estate, 217 Pa. 307.* See: *Boyd* v. *United States, 116 U. S. 616; 29 L. Ed. 746; Weeks* v. *United States, 232 U. S. 383; 56 L. Ed. 652; Silverthorne Lumber Co.* v. *United States, 251 U. S. 385; 64 L. Ed. 319; Amos* v. *United States, 255 U. S. 313; 65 L. Ed. 654; Gouled* v. *United States, 255 U. S. 295; 65 L. Ed. 647; Olmstead* v. *United States, 277 U. S. 438; 72 L. Ed. 944.*

To grant petitioner's application would in my judgment amount to an unconstitutional invasion of the right of personal privacy of the defendant and of the child.

For the above reasons the petition is denied.

This disposition of the motion makes it unnecessary for the court to make any special provision for the protection of

the child. She is not and cannot be made a party to the suit (*Quigley* v. *Quigley, 45 Hun.* (*N. Y.*) *23*) although a decree in favor of the petitioner may profoundly affect her social and property rights. By reason of her minority her constitutional rights may not be waived and must be carefully protected by the court, for she is a ward in Chancery. Her immunities are not less than those of the defendant, but are independent of them.

In *Beuschel* v. *Manowitz, 241 App. Div. 888; 272 N. Y. S. 165,* the Appellate Division reversed the trial court in ordering a blood grouping test in an action for carnal assault which resulted, as was claimed, in the birth of a child. In its reversing opinion the court observed:

"This child is not a party to this action; and while a Court of Chancery has inherent jurisdiction over the welfare of an infant, a ward of the court, nothing in this case indicates in the slightest that the welfare of this infant is in any wise involved or that the blood test could possibly be beneficial to the infant."

While this case was decided before the amendment to the Civil Practice act permitting blood grouping tests, the quoted portion of the opinion is still good law, as it seems to me, because the action was one for damages and, as the court pointed out, the infant could not possibly have been benefited by the result of the case.

In *Franken* v. *State, ex rel. Fuerst (1926), 209 N. W. Rep. 766,* the Supreme Court of Wisconsin in a bastardy proceeding held that the protection of the public is secondary to the interests of the child. The opinion stated in part as follows:

"We have, therefore, two parties interested * * * in a bastardy proceeding * * * who may be termed innocent parties, viz., first the child, and second the public, and as between the two * * * the principal object is the welfare of the child, and the secondary one that of the public."

This court would not have felt justified in ordering a blood grouping test of the infant without first appointing a guardian *ad litem* to appear in her separate interest. So far in this case such an appointment has been unnecessary, but in the event of an appeal a guardian should be appointed.