26 N.J. Super. 316 (1953)
97 A.2d 641
VIRGINIA K. MILLER, SUCCESSOR IN OFFICE TO ALICE FRANK, DIRECTOR OF WELFARE OF THE TOWNSHIP OF BRIDGEWATER, PLAINTIFF-RESPONDENT,
v.
ANDREW DOMANSKI, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1953.
Decided June 18, 1953.
*317 Before Judges EASTWOOD, BIGELOW and JAYNE.
Mr. Charles A. Reid, Jr., argued the cause for the plaintiff-respondent.
Mr. Jerome J. Heyman argued the cause for the defendant-appellant (Mr. Myron L. Levy, attorney).
The opinion of the court was delivered by EASTWOOD, S.J.A.D.
The defendant Andrew Domanski appeals from an adverse judgment in a bastardy proceeding under R.S. 9:17-1 et seq., entered in the Somerset County Court. The cause was heard de novo by the County Court, sitting without a jury, and resulted in an adjudication of paternity of a child born out of wedlock to C.B. The defendant appeals from the ensuing judgment of filiation.
Dr. Phillip Levine, a medical expert, in preparation for the trial pursuant to L. 1939, c. 221 (N.J.S. 2A:83-2 and 3), was authorized by the court to make blood grouping tests of the mother, the child and the putative father. Dr. Levine testified that while his tests did not exclude paternity, he *318 would like to testify concerning "an assumption that the mother's blood has a very rare and unusual serologic makeup." The trial court refused to permit the doctor's supplementary qualifying testimony.
As we view this appeal, we think the primary controversial question concerns the trial court's exclusion of the aforementioned testimony of Dr. Levine. This issue necessarily poses the question of the limitations, if any, of the statute (N.J.S. 2A:83-2) as a legislative expression of public policy, permitting the testimony of a medical expert on the results of blood grouping tests performed pursuant thereto. The pertinent provisions of the statute are:
"Whenever it is relevant to the case of the prosecution or the defense in a proceeding involving parentage of a child, the trial court, by order, may direct that the mother, her child and the defendant submit to one or more blood grouping tests to determine whether or not the defendant can be excluded from the probability of being the father of the child. The testimony of experts to the result of the test shall be receivable in evidence, but only in cases where definite exclusion of parentage of the defendant is indicated. The tests shall be made by duly qualified physicians, to be appointed by the court. Such experts shall be subject to cross examination by both parties after the court has caused them to disclose their findings to the court or to the court and jury. * * *"
Dr. Levine, testifying as to the results of his examination, stated:
"Because of a very unusual serologic finding, I could not use my usual report. Where there is no exclusion of paternity, there is a qualified serologic detail, which I will disclose if I have the opportunity. * * * The tests in this case would show no exclusion, but we have to make the assumption that the mother's blood has a very rare and unusual serologic makeup. If she had a usual serologic makeup, why then, it would have to be considered an exclusion. * * * In short, your Honor, the scientific facts in this case were not available to me and to workers in the field in 1939 when this New Jersey Statute became effective.
Q. `These tests in this case show no exclusion.' Is that the wording? A. That's right." (Italics ours)
Towards the turn of the century, Dr. Karl Landsteiner discovered that the blood of all persons was not homogeneous, but that the blood of each individual could be classified in *319 one of several distinguishable types of blood (called "phenotypes"). This heterogeneous quality of the blood coupled with the incompatibility of certain blood groups (i.e., reactions caused by mixing different types of blood), form the basis upon which serological blood tests theories are predicated. 163 A.L.R. 941.
Dr. Landsteiner discovered the presence of two genes (also known as antigens or agglutinogens), called "A" and "B," in the human blood. The theory of blood groups was discovered by a mathematician named Bernstein in 1925. During the next five or ten years, certain rules laid down by him were confirmed by long statistical and family studies.
In 1928, Doctors Landsteiner and Levine discovered two new genes in the red corpuscles called "M" and "N." Every person has either an "M" or "N" gene, or both "M" and "N" genes in his red blood cells. These genes are entirely independent of the genes "A" and "B."
According to the Landsteiner-Bernstein theory, it is possible to determine in which group the blood of a particular person belongs by mixing a sample of his blood with solutions containing the antibodies or aglutinins and observing whether or not the blood clots (or agglutinates).
For a more thorough discussion of the medical and legal aspects of blood grouping tests and the scientific development thereof by the late Dr. Landsteiner and Doctors Bernstein, Levine, and Alexander S. Wiener, see 163 A.L.R. 939-961 and Schatkin's Disputed Paternity Proceedings (1947).
Blood grouping tests are most frequently, but not exclusively, resorted to in proceedings, both civil and criminal, in which paternity is in issue. According to serological blood-test theories, it is possible not only to identify the type of blood of any given individual, but also to exclude paternity (or maternity) in certain instances. The test, however, is only of use to prove non-paternity; paternity cannot be proven by these experiments. In other words, the results of the tests either exclude paternity or are inconclusive. It has been established that "M" and "N" genes are transmitted from parents to child in accordance with the Mendelian law *320 observed in the inheritance of many characters in animals and plants discovered by Gregor J. Mendel (an Austrian Augustinian abbot, 1822-84), in breeding experiments made by him. Neither gene "M" nor gene "N" can appear in the blood of a child unless it is present in at least one of its parents. On the basis of these discoveries it has been demonstrated that parents belonging to given blood groups can only have children with certain types of blood, and no other.
In the adoption of the act the purpose of our Legislature seemed clear enough, but some doubts were cast thereon by the decision in Bednarik v. Bednarik, 18 N.J. Misc. 633 (Ch. 1940), a divorce action, wherein a request for compulsory blood grouping tests was denied as an invasion of the individual's right of privacy, and collaterally as contrary to the statutory privilege against self-incrimination. The Bednarik case was the only reported case construing this statute until 1950, when the Chancery Division of the Superior Court, in the case of Anthony v. Anthony, 9 N.J. Super. 411, held contra to the Bednarik case and granted an order for blood grouping tests to aid in an issue of paternity involved in a matrimonial action. The court in that case declared that the Legislature, in enacting the enabling legislation, reflected a recognition of
"* * * `the theory that the evolution in practical affairs of life, whereby the progressive and scientific tendencies of the age are manifest in every other department of human endeavor, cannot be ignored in legal procedure, but that the law, in its efforts to enforce justice by demonstrating a fact in issue, will allow evidence of those scientific processes which are the work of educated and skillful men in their various departments, and apply them to the demonstration of a fact,' State v. Cerciello, 86 N.J.L. 309, 314, 90 A. 1112 (E. & A. 1914)."
Thereafter, the Appellate Division of the Superior Court in Cortese v. Cortese, 10 N.J. Super. 152 (1950), affirmed the holding of the admissibility of the results of blood grouping tests to aid in disproving paternity, stating:
"* * * The substantial weight of medical and legal authority attests their accuracy, not to prove paternity, and not always to *321 disprove it, but `they can disprove it conclusively in a great many cases provided they are administered by specially qualified experts,' Beach v. Beach, 72 App. D.C. 318, 114 F.2d 479, 480, 131 A.L.R. 804 (D.C. Cir. 1940), * * *"
citing Annotation, 163 A.L.R. 923; Jordan v. Mace, 144 Me. 351, 69 A.2d 670 (Sup. Jud. Ct. 1949); Report, Committee on Medicolegal Blood-grouping Tests, 108 Am. Med. Ass'n Journal, 2138-2142 (June, 1937). A wealth of medical, scientific and legal references will be found in Schatkin, Disputed Paternity Proceedings (2d ed. 1947), p. 184; 1 Wigmore on Evidence (3d ed. 1940), sec. 165a et seq.
In all the decisions of our courts touching upon evidence of the results of blood grouping tests it will be observed that it has confined admissibility to those instances provided for by the legislative enactment, i.e., where the results indicate exclusion of paternity. Ross v. Marx, 24 N.J. Super. 25, 26 (App. Div. 1952); Cortese v. Cortese, supra. It is also observed that from the early days of recognition of the value of these tests there have been rather strict limits placed upon their use, and it is generally agreed that the only practical value of the tests is a negative one; that it cannot be used to establish paternity but as evidence of non-paternity. 104 A.L.R. 447; 115 A.L.R. 167; 20 Am. Jur., Evidence, sec. 352, p. 326; 163 A.L.R. 959; Wigmore on Evidence, sec. 165a, p. 610.
Judge Proctor, in the case of Ross v. Marx, supra, at p. 28, after noting that the committee of medical experts in a report in The Journal of the American Medical Association recognized the inconclusive effect of the results of serological tests, stated:
"In view of the acknowledgment of the above mentioned possible exceptions, it cannot be said that the results of the blood grouping tests excluding paternity are conclusive. The statute (N.J.S. 2A:83-3) provides that the testimony of experts to the results of blood grouping tests `shall be receivable in evidence' where definite exclusion is indicated, but the Legislature, perhaps advisedly, made no provision that the results are conclusive."
On the other hand, as pointed out by Judge Proctor, several cases appear to hold that the results of the tests excluding *322 paternity, when competently made, are conclusive. Jordan v. Mace, supra; "C" v. "C," 200 Misc. 631, 109 N.Y.S.2d 276 (Sup. Ct. 1951); Commissioner of Welfare v. Costonie, 277 App. Div. 90, 97 N.Y.S.2d 804 (Sup. Ct. 1950).
As a general rule the Legislature may make one fact evidential of another, within certain limitations, although it is impossible to formulate a rule that will state accurately the precise limitations upon the legislative power to declare what shall be prima facie evidence of a fact, each case depending largely upon the circumstances of that case. 20 Am. Jur., Evidence, sec. 9, p. 39.
Where a scientific advancement has been made in the field of medicine to the degree where, with some accuracy, under proper circumstances, certain conclusions may be excluded as the producing cause of a resultant condition, and that fact has enjoyed legislative sanction as a proper evidential aid to the courts, but does not admit of that degree of infallibility, or preciseness, as to be a conclusive determination thereof, then, it seems to us, such evidential aid must be employed with utmost caution and only to the degree sanctioned by the Legislature which endorsed its use. It was so held in the case of State ex rel. Freeman v. Morris, 156 Ohio St. 333, 102 N.E.2d 450, 451 (Sup. Ct. 1951). There, the statute, similar to ours, provided that "In cases where exclusion is established the results of the tests together with the findings of the expert or experts of the fact of nonpaternity shall be receivable in evidence." Gen. Code Ohio, § 12122-2. The trial court permitted, over the objection of the defendant, the expert to testify at length as to the results of his blood grouping tests and the appellate court held that "Under the limitations prescribed by our statute the evidence should have been excluded."
While blood tests cannot definitely ascertain that A is the father of B, it is asserted that in certain limited cases it can be established that A is not the father of B. It is this negative or exclusionary result which our statute recognizes as possessing the degree of accuracy or quality of reliability to constitute an evidential aid to the courts where *323 paternity is an issue. To permit Dr. Levine to testify that an "assumption that the mother's blood has a very rare and unusual serologic makeup," attempting thereby to explain away the failure to attain a negative result in the tests, would be to admit the testimony of additional scientific facts not available to experts in that field in 1939, when the statute in question was adopted, and thereby impel judicial recognition thereof contrary to the legislative expression of public policy, or would constitute a mere attack upon the reliability of exclusionary findings in the tests. If it be the latter, the evidence is properly excluded inasmuch as the inconclusive nature of the tests is recognized and such evidence is mere surplusage. If it be the former, this court is not prepared to give its stamp of judicial approval to alleged scientific advancement in methods or techniques which the Legislature has not seen fit to recognize by its legislative amendatory processes. Unlike techniques of scientific fingerprinting, photography, X-ray photographs and the like, the evidential use of which is not statutorily limited, but admissible when established by competent evidence, on the basis of widely accepted approval, as testimonial of their reliability, blood grouping tests are admissible as an evidential aid only for the limited exclusionary field referred to.
As stated in 1 Wigmore on Evidence, sec. 165a, p. 612:
"The progress of science will no doubt make it possible from time to time to increase the range of the cases that afford decisive proof, both negative and affirmative. Already, by judicial decision or by statute, the law has accepted the use of blood-group composition to evidence paternity negatively,  of course, only when testified to by a qualified expert."
It may well be that in the light of the scientific facts, the knowledge of which, as stated by Dr. Levine, has been acquired by the experts in this field since the adoption of our statute in 1939, there should be an appropriate amendment thereto. However, for this court to hold that the exclusion of Dr. Levine's proffered testimony was erroneous would, in our opinion, violate the clear intendment of the statute and result in judicial legislation.
*324 In view of the fact that Dr. Levine testified that "the tests in this case show no exclusion," we conclude that there was no error in the court's ruling.
We have reviewed the record and find that the judgment of the County Court concluding paternity of the defendant was not against the weight of the evidence.
We have also examined the proceedings in this matter and do not find them to be in conflict with R.S. 9:17-1 et seq.
The judgment of the Somerset County Court is affirmed.
BIGELOW, J.A.D. (dissenting).
In preparation for the trial the County Court, pursuant to L. 1939, c. 221, now embodied in N.J.S. 2A:83-2 and 3, ordered that Dr. Philip Levine make blood grouping tests of the mother, the child and the putative father. The statute provides that testimony to the result of the test shall be receivable in evidence, but "only in cases where definite exclusion of parentage of the defendant is indicated." At the trial, Dr. Levine testified:
"Because of a very unusual serologic finding, I could not use my usual report. Where there is no exclusion of paternity, there is a qualified serologic detail, which I will disclose if I have the opportunity. * * * The tests in this case would show no exclusion, but we have to make the assumption that the mother's blood has a very rare and unusual serologic makeup. If she had a usual serologic makeup, why then, it would have to be considered an exclusion. * * * In short, your Honor, the scientific facts in this case were not available to me and to workers in the field in 1939 when this New Jersey Statute became effective. * * *
Q. "These tests in this case show no exclusion.' Is that the wording? A. That's right."
The court then ruled, over objection by the defendant, that the doctor could not disclose his findings or his opinion based thereon, because the tests did not show a definite exclusion of parentage. This ruling is presented as a reason for reversal.
Upon a trial without a jury, when the court is doubtful whether proffered evidence is admissible, it is good practice for the court to receive the evidence in the first instance and then, on final study of the case, if the court becomes satisfied *325 that the evidence was inadmissible, to exclude it from consideration. In this manner the necessity is avoided of reaching a hasty decision on the question. And also is avoided the necessity of reopening the proofs to receive testimony that the court rejected but, upon reflection, found to be admissible. Seitz v. Seitz, 1 N.J. Super. 234 (App. Div. 1949). The preliminary statements of Dr. Levine, quoted above, are not at all clear. I gather  but with little assurance that I am correct  that he intended the court to understand that further study of blood grouping during the past dozen years has revealed a more complicated situation than scientists were aware of when the statute of 1939 was passed; that in some instances at the present time, the conscientious expert can speak only of probabilities and not of absolutes; he can give his opinion but not a categorical answer. See Ross v. Marx, 24 N.J. Super. 25 (App. Div. 1952). The present case seems to have been one of these instances. The court should have questioned Dr. Levine further in order to bring out clearly what he meant  even though thereby the doctor's opinion on the question of paternity might have been disclosed.
In considering whether the doctor's opinion should have been received, we ought to remember "the public interest in permitting the courts to learn the truth of the questions at issue." Bartletta v. McFeeley, 107 N.J. Eq. 141 (Ch. 1930), affirmed 109 N.J. Eq. 241 (E. & A. 1931). "Our new judicial system has for its cornerstone the discovery of truth wherever possible, without infringement upon constitutional rights or privileges." State v. Alexander, 7 N.J. 585, 595 (1951). Had there been no statute relating to blood grouping tests, the doctor's testimony describing the tests which he made, the primary results and his opinion based thereon, would have been competent evidence. "The modern trend in the law of evidence favors both a liberal rule of admissibility and the giving of a broad discretionary control to the trial judge." Delaware L. & W.R. Co. v. City of Hoboken, 16 N.J. Super. 543, at 556 (App. Div. 1951), reversed on another point, 10 N.J. 418 (1952). And see Ladd, 27 Iowa *326 Law Rev. 214 (1942), Appendix to A.L.I. Model Code of Evidence.
Treating of the admissibility of fingerprints, the court said in State v. Cerciello, 86 N.J.L. 309 (E. & A. 1914),
"that the law in its efforts to enforce justice by demonstrating a fact in issue, will allow evidence of those scientific processes, which are the work of educated and skillful men in their various departments and apply them to the demonstration of a fact, leaving the weight and effect to be given to the effort and its results entirely to the consideration of the jury."
Accordingly courts receive testimony based on the microscope, chemical tests, X-ray photographs, or cardiograms; and on occasion admit as exhibits motion pictures, with or without accompanying sound, as well as phonograph records; and in State v. Alexander, supra, evidence of the result of tests to determine defendant's blood type. Professor Wigmore states that "Any process or instrument furnishing abnormal aid to the senses may thus be employed as a source of testimonial knowledge," subject to proof of trustworthiness. Wigmore, Evidence (1940 ed.), § 795. He considers evidence of blood grouping tests, in paternity cases, to be admissible on general principles. "But that thus far this trait (in the present state of scientific discovery) can be used only negatively, i.e., to evidence that a particular man P is not the father of a particular child C." And he adds: "The progress of science will no doubt make it possible from time to time to increase the range of the cases that afford decisive proof both negative and affirmative." § 165a. In Cortese v. Cortese, 10 N.J. Super. 152 (App. Div. 1950), the admissibility of evidence of blood grouping tests is treated not as dependent upon the statute, but upon the general law of evidence:
"It is plain we should hold, as we do, that this unanimity of respected authorities justifies our taking judicial notice of the general recognition of the accuracy and value of the tests when properly performed by persons skilled in giving them. The law does not hesitate to adopt scientific aids to the discovery of truth which have achieved such recognition." *327 And see Bednarik v. Bednarik, 18 N.J. Misc. 633 (Ch. 1940).
In the absence of statute, the testimony of Dr. Levine, relative to the blood tests he had made and the conclusions he had reached, would have been clearly admissible.
Does the statute, L. 1939, c. 221, prevent the reception of the evidence? When enacting it, the Legislature understood correctly that blood grouping tests could not prove that the defendant was actually the father of the child. Cortese v. Cortese, supra. And undoubtedly the Legislature feared that if the expert were allowed to testify that his tests did not exclude the defendant, the negative might be accepted by the jury as a circumstance corroborating the charge that he was the father; so they enacted that the expert's testimony should be received only "in cases where definite exclusion of parentage of the defendant is indicated." Cf. State v. Alexander, supra, where evidence was received that blood on the handle of the knife with which a murder had been committed, was of the same type as defendant's blood. And Shanks v. State, 185 Md. 437, 45 A.2d 85, 163 A.L.R. 931 (Md. 1945), where similar evidence was received as tending to prove guilt, although 45% of the population had the same type blood. The statutory rule that results of the blood grouping tests should be received in evidence only if an exclusion of parentage is indicated, was enacted solely for the benefit of the defendant. No object of public policy is involved.
"The general rule is that no contract or agreement can modify a law, but the exception is that where no principle of public policy is violated, parties are at liberty to forego the protection of the law. Statutory provisions designed for the benefit of individuals may be waived, but where the enactment is to secure general objects of policy or morals, no consent will render a noncompliance with the statute effectual." Quick v. Corlies, 39 N.J.L. 11 (Sup. Ct. 1876).
Thus, in the case cited, it was resolved that the statute of limitations may be waived by the defendant. And likewise the statute of frauds. Douma v. Powers, 92 N.J. Eq. 25 *328 (Ch. 1920). And the statutory command, where a bond and mortgage are given for the same debt, that foreclosure shall be the first step in the collection of the debt. Callan v. Bodine, 81 N.J.L. 240 (Sup. Ct. 1911). The representative of a deceased person may waive the benefit of the statute which renders the opposite party incompetent to testify to transactions with the deceased. Rowland v. Rowland, 40 N.J. Eq. 281 (E. & A. 1885). And a spouse sued for divorce on account of adultery may waive his or her right to refuse to testify. Schaab v. Schaab, 66 N.J. Eq. 334 (E. & A. 1904).
In the present case, the defendant not only waived objection, but urged that the evidence be admitted. As we have already pointed out, the evidence was admissible under general principles, unless prohibited by the statute. The plaintiff could not interpose the bar of the statute, for it was not fashioned for her protection. Not only was it well within the discretionary power of the trial judge to receive Dr. Levine's testimony but, under the circumstances, I think that the court erred in excluding it.