STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
McKINLEY ALEXANDER, DEFENDANT-APPELLANT.

Argued September 10, 1951—Decided September 24, 1951.

*Mr. Louis C. Friedman* argued the cause for appellant.

*Mr. Donald G. Collester* argued the cause for respondent.

The opinion of the court was delivered by

WACHENFELD, J.   This is an appeal in a homicide case in which the defendant was convicted of second-degree mur-·der and sentenced to 18 to 25 years.

The State charges the defendant stabbed the deceased, Daisy Thomas, through the heart with a bread knife and then ·pushed her through a plate glass window, while the defense contends the death of the deceased was caused not by a knife but by a large piece of plate glass which entered her heart when she went through the broken window pane.

Self-defense was also relied upon, it being asserted the deceased cut the defendant with the knife and whatever he did thereafter was in an endeavor to protect himself.

Some time in 1944 the defendant met the deceased, Daisy Thomas, and their friendship ripened into an intimate relationship which continued for a number of years without benefit of a marriage ceremony. A child was born to them and was known as Betty Thomas. Four years later they separated and the child was entrusted to the care of the deceased's sister.

Some time thereafter Daisy became acquainted and began going around with John Wallace, who subsequently moved into her apartment, and they informed relatives they were planning to marry. When this information was imparted to the defendant, he determined to take custody of his child. He succeeded in doing so and took her to his lodging.

The deceased, upon learning of the disappearance of her daughter, armed herself with a kitchen knife and sallied forth in search of her. Informed of the child's whereabouts, she entered the defendant's house and came out carrying the child in her arms. Holding the infant to her breast with her left arm and with the knife in her right hand, she started up the street, where she was accosted by the defendant. The incident which resulted in her death took place on the sidewalk in front of an empty store located at 152 River Street in the City of Paterson.

The State's theory is that the defendant attempted to take the child from Daisy Thomas and in doing so was cut on the hand with the knife she was carrying; he then became enraged, took the knife from her and plunged the blade of it into her body, piercing her heart and cutting the arm of the child. As he pulled the knife from the breast of the deceased, he pushed both mother and child through a plate glass window of the store front, shattering it.

Daisy's screams attracted nearby persons who hurried to the scene and found her lying across the broken window, partly inside and partly outside the store. The knife lay on

the sidewalk a few feet away. She was taken by ambulance to the hospital but died on the way.

The defendant was arrested and, prior to his trial, was examined by a doctor associated with the Paterson Board of Health who extracted a specimen of the defendant's blood for laboratory analysis to determine whether he had a venereal disease. The board of health, after making these tests, turned over to the police authorities an unused portion of the blood, which was analyzed by them to determine the defendant's blood type.

There were no eye witnesses to the affray and the State's case was based entirely upon expert testimony, plus the evidence of the witnesses who testified to the facts and circumstances as they developed prior to and following the occurrence of the incident itself.

Little more need be said concerning the facts as it is not contended the verdict was against the weight of the evidence, the appeal being limited to challenging (1) the accuracy of the court's charge defining murder in the second degree; (2) the propriety of expert testimony of the chief medical examiner as to what instrument caused the death of the deceased; and (3) the State's right to use the defendant's blood, which it is contended was taken against his will and without his consent, as evidence against him at his trial to show his blood was of the same type as that found on the handle of the knife in question. These matters will be disposed of in inverse order.

The same query is advanced a number of times but in each effort a different foundation or premise is relied upon.

First, it is alleged error was committed in permitting the evidence as to the defendant's blood type, since the blood was taken while he was in jail awaiting trial, when he was without counsel, on the ground that such evidence was a denial and an invasion of the defendant's rights and privileges against self-incrimination.

Second, it is said that such evidence was a denial and an invasion of the defendant's rights against unreasonable search

and seizure, guaranteed to him under the New Jersey Constitution.

Third, the evidence was improper under the New Jersey Constitution as it violated Article I, paragraph 1, of the Constitution of 1947.

Fourth, it was a denial of due process of law under the common law which is embraced in this State.

Fifth, the defendant was deprived of civil rights under chapter 13, secs. 241 and 242, of Title 18 of the *United States Statutes* and therefore deprived of his rights under the 4th, 5th and 14th Amendments of the United States Constitution.

(1) The defendant alleges he never gave his blood with the understanding that it was to be used against him at his trial for murder and, before a consent to such use could be spelled out, the State must show affirmatively that he had full knowledge of all the facts when he permitted his blood to be taken.

He relies upon *McManus v. Commonwealth,* 264 *Ky.* 240, 94 *S. W. 2d* 609 (*Ct. of App. Ky.* 1936); *People v. Corder,* 244 *Mich.* 274 (*Sup. Ct. Mich.* 1928); *State v. Matsinger,* 180 *S. W.* 856 (*Sup. Ct. Mo.* 1915); *State v. Horton,* 247 *Mo.* 657, 153 *S. W.* 1051 (*Sup. Ct. Mo.* 1913); *State v. Newcomb,* 220 *Mo.* 54, 119 *S. W.* 405 (*Sup. Ct. Mo.* 1909), all of which involved examinations of the defendant against his will, while in jail, for the purpose of determining if he had a venereal disease, and where the evidence so procured was subsequently used in proof of a rape charge against him. He cites also *Apodaca v. State,* 146 *S. W. 2d* 381 (*Ct. of Cr. App. Tex.* 1940), which involved intoxication tests made upon the accused for use in evidence in an action against him for murder without malice caused by striking a person with an automobile.

Admittedly these cases sustain the defendant's view but they are offset by a wealth of authority to the contrary. Wigmore, in volume VIII of his work on *Evidence* (*3d ed.*), *sec.* 2263, notes that the privilege against self-incrimination

was established in the common law to protect the individual against "the employment of legal process to *extract from the person's own lips* an admission of his guilt." Discussing the limitations of the privilege, he says:

"\* \* \* if the privilege extended beyond these limits, and protected an accused otherwise than in his strictly testimonial status,— if, in other words, it created inviolability not only for his physical control of his own vocal utterances, but also for his physical control in whatever form exercised, then it would be possible for a guilty person to shut himself up in his house, with all the tools and indicia of his crime; and defy the authority of the law to employ in evidence anything that might be obtained by forcibly overthrowing his possession and compelling the surrender of the evidential articles,—a clear '*reductio ad absurdum.*' "

While the identical question raised here has never been passed upon in this State, there are decisions closely analogous that forecast the answer. In *Bartletta v. McFeeley,* 107 *N. J. Eq.* 141 (*Ch.* 1930), affirmed 109 *N. J. Eq.* 241 (*E. & A.* 1931), where it was claimed the photographing and fingerprinting of the defendant after arrest were unlawful, the court said:

"The right of the police to fingerprint and photograph is powerfully supported by the argument from convenience and from the public interest in permitting the courts to learn the truth of the questions at issue. This right is also upheld by custom. The police in the large cities of this state and throughout the country for half a century have measured, photographed or fingerprinted prisoners before trial; and their authority to do so has been seldom questioned. \* \* \*"

The defendant, in *State v. Auld,* 2 *N. J.* 426 (1949), charged that his constitutional immunities from self-incrimination were violated by requiring him to submit to mental examinations prior to trial and then introducing into evidence statements which he so made to examining physicians. There we said:

"The purpose of the federal constitutional provision against self-incrimination is not applicable to our criminal procedure and has not been adopted in our Constitution 'yet the doctrine of the clause, so far as it expresses the rule of the common law as we have adopted it, is

the rule of our courts in the admission of evidence in criminal cases. It has been declared in this court that the doctrine of the common law in that respect has full force, and that no person can be compelled to be a witness against himself, *State v. Zdanowicz*, 69 *N. J. L.* 619 (*E. & A.* 1903).'"

Again:

"The right of a defendant to be protected against self-incrimination applies to involuntary subjection to the questioning and this case is devoid of anything showing that any statements made to the examining doctors were involuntary. The record is quite to the contrary."

In *State v. Davis*, 57 *A. 2d* 289 (*Ct. of App. Md.* 1948), the defendant, convicted of murder, raised only one question on appeal, the admission in evidence, over his objection, of a sample of blood taken from his body, which he contended was unlawfully compelling him to testify against himself. In its decision the court classified the taking of the defendant's blood with the taking of his fingerprints, saying:

"We are unable to see where there is any constitutional question involved in this case. There is no substantial difference between obtaining a specimen of blood from an accused and obtaining his fingerprints, or physical property, the possession of which by him is a pertinent question at issue in a felony charge against him. Whatever may be the rule in other jurisdictions, we have long since adopted the rule that the admission of evidence thus obtained is not a violation of the Maryland Declaration of Rights, and we so hold in this case."

The court decided this identical question in a recent case in Pennsylvania, *Commonwealth v. Statti*, 166 *Pa. Super.* 577 (*Super. Ct. Pa.* 1950). The blood of the accused had been taken without his consent for typing and he was subsequently convicted of assault and robbery with intent to commit rape. The defendant's blood type was presented at the trial and objection made that this violated the defendant's privilege against self-incrimination. The court, referring to *Commonwealth v. Musto*, 348 *Pa.* 300, said:

"While the exact question thus presented * * * has apparently not been ruled upon by either of our appellate courts, it has arisen in many other jurisdictions, and these have quite uniformly held that the

constitutional immunity from self-incrimination does not apply to a compulsory examination to determine the prisoner's physical or mental condition for the purpose of testifying in regard thereto, provided, of course, that he be not compelled to answer any questions propounded to him by those making the examination. The purpose of the constitutional provision is to prohibit the compulsory oral examination of the prisoner either before or at trial,—to prevent his being required to incriminate himself by speech or the equivalent of speech."

The Supreme Court of New Hampshire in *State v. Sturtevant*, 70 *A. 2d* 909 (1950), encountered the same question and disposed of it in this language:

"The constitutional provision invoked appears with varying phraseology in our Federal Constitution and those of most of the States; but because of their common historical origin, the variations are not considered to alter the essential meaning. * * * Whatever their form, the purpose of the provisions may be regarded as uniform; to protect an accused 'from any disclosure sought by legal process against him as a witness.' * * * It is sufficient for our purposes to recognize that the authorities establish the privilege to be one against testimonial compulsion only, and that it is inapplicable to cases such as this where the evidence is real rather than testimonial."

The issue arose again in *State v. Cram*, 176 *Or.* 577, 160 *P. 2d* 283, 164 *A. L. R.* 952 (*Sup. Ct. Or.* 1945), where a sample of blood was extracted from the defendant for the purpose of analyzing it for alcoholic content. The court cited with approval our case of *Bartletta v. McFeeley, supra,* and outlined the many things which the defendant can be compelled to do without violating his constitutional rights.

Taking into consideration the origin and history of the rule of privilege against self-incrimination, its scope and purpose and the protection to be afforded thereby, we have no hesitancy in subscribing to the doctrine as enunciated by these cases last cited, reflecting as they do the trend of our own decisions as to the rule which should prevail here.

(2) It is also contended the taking of the defendant's blood against his will for the purpose of using it in evidence was a denial and an invasion of his rights against unreasonable search and seizure guaranteed him by Article I, paragraph 7, of the New Jersey Constitution of 1947.

Admitting the rule in this State to be as applied by the court below but asserting our law should be changed to conform with the federal practice, counsel argues: "This point deserves a re-examination under our new judicial system and should also be re-examined by the Legislature."

With the latter suggestion we cannot concern ourselves, but a judicial re-examination as requested brings us out to a reaffirmation of our present rule.

In *State v. MacQueen,* 69 *N. J. L.* 522 (*Sup. Ct.* 1903), Mr. Justice Pitney held:

"And it would seem that after arrest made the person of the accused may properly be examined without a search-warrant in order to find evidence of his guilt, and that such an examination would not be deemed an unreasonable search."

This rule was firmly embraced in *State v. Gould,* 99 *N. J. L.* 17 (*Sup. Ct.* 1923), while in *State v. Merra,* 103 *N. J. L.* 361 (*E. & A.* 1927), Chief Justice Gummere, speaking for the Court of Errors and Appeals, said:

"it is entirely settled in this state that property procured by an unjustifiable search and seizure is admissible in evidence, if evidential *per se.*"

Our Superior Court under the new judicial system likewise construed the rule in *State v. Pinsky,* 6 *N. J. Super.* 90 (*App. Div.* 1950), saying:

"The appellants objected to the reception in evidence of the papers seized at the time of the arrest, on the ground that the police had no search warrant. Since it does not appear that the arrest was unlawful, no search warrant was required to make legal the seizure of the evidence, *State v. MacQueen,* 69 *N. J. L.* 522 (*Sup. Ct.* 1903) ; 6 *C. J. S., Arrest, Sec.* 17. And even if the papers were unlawfully seized, they were still admissible in evidence. *State v. Lyons,* 99 *N. J. L.* 301 (*E. & A.* 1923). Appellants argue that documents unlawfully taken are not admissible unless 'evidential *per se,*' which they understand to mean that they are not admissible if their materiality is not self-evident, but must be established by explanatory testimony. This is not the meaning of the expression 'evidential *per se*' used in *State v.*

*Lyons* and some of our other cases. That expression means no more than that the papers are material and competent, when we leave out of consideration the manner in which the State obtained the papers."

No convincing thought or reason has been suggested warranting us in discarding a rule of constitutional construction which has for many years demonstrated its practical worth and its soundness in the administration of justice in this jurisdiction. Our new judicial system has for its cornerstone the discovery of truth wherever possible, without infringement upon constitutional rights or privileges. The abandonment of the present practice, in our opinion, would be a step backward and inimical to the public good.

(3) The defendant cites Article I, paragraph 1, of the New Jersey Constitution of 1947 and insists the receipt of the evidence as to the defendant's type of blood was a denial and invasion of the rights bestowed by this provision of the Constitution. No authorities are submitted nor are additional reasons given, other than those already resolved on the argument heretofore urged. The disposition there made is controlling here.

(4) Projecting the same thought with a different emphasis, the defendant asserts the admission of such evidence was a denial to him of due process of law under the common law, which is the law of New Jersey, and invokes the Magna Carta as an aid to construing the meaning of the 14th Amendment. The argument advanced here is essentially a duplication of the reasons put forth under the first point and the answer is found in the discussion thereunder.

The defendant was deprived of his rights, it is said, under chapter 13, secs. 241 and 242, of Title 18 of the *United States Statutes* and therefore has been deprived of his rights under the 4th, 5th and 14th Amendments of the United States Constitution.

Section 241 provides where two or more persons conspire to injure, oppress, threaten or intimidate any citizen in the enjoyment of any privileges or rights secured him by the Constitution or laws of the United States, they shall be pun-

ished by a certain fine or a certain term of imprisonment. Section 242 similarly provides that whosoever, under color of any law, statute, ordinance and so forth, willfully subjects any habitant of a state, territory or district to deprive him of any rights or privileges secured or protected by the Constitution or laws of the United States, shall be subject to a certain fine and certain term of imprisonment.

We are unable to grasp the relationship of these statutes to the questions presented in the case presently before us. They do not confer any further rights, privileges or immunities upon the individual but are designed to safeguard those rights by making the violation of them a criminal offense.

The evidence as to the defendant's type of blood was not a denial or invasion of the defendant's common law, constitutional or statutory right or privilege against self-incrimination.

The next ground of error assigned by the defendant is the court's refusal to strike the testimony of the county's chief medical examiner who performed the autopsy on the deceased the morning following her death.

The witness testified that his examination revealed a clean cut through the outer skin to the left of the breastbone and between the third and fourth ribs. The penetration proceeded downward and inward, making a clean cut through the pericardium and into the heart itself and resulting in a fatal hemorrhage. Nicks were noted on the lower edge of the third rib and on the upper edge of the fourth. The edges of the wounds in the tissues were turned neither inward nor outward, as would normally result from the insertion or withdrawal of a dull instrument. The witness therefore concluded the incision had been made by "a sharp cutting instrument" and so recorded his opinion in his primary report of the autopsy.

Later that day, the examiner saw the knife which was found at the scene and told the detectives present he "felt" the wound had been caused by a double-edged instrument and

admitted on the stand he had in mind a piece of glass as such an instrument.

Before making his final report, however, the doctor did two things: first, he secured and studied photographs of the wounds to the heart and pericardium made at the time of autopsy; second, he sent to a laboratory, for examination, the dress which the decedent had been wearing, where tests were made by a technician of long experience indicating the cut in the material, corresponding in location and dimension to the cut in the body of the deceased, was made by a sharp instrument. Each of these developments confirmed his original conclusion as to the nature of the fatal wound.

The questioning of the witness was frequently interrupted by long colloquies between the court and the opposing counsel and the purport of his answers is not always entirely clear. True, he stated on cross-examination that he considered the laboratory report before reaching his final conclusion, but a careful reading of the record indicates the witness had based his original opinion on personal study and observation and had in fact arrived at his determination before the laboratory report was received and his opinion was confirmed by the study of the photographs. If this is what the witness intended to convey, and we think it is from a careful reading of the record, it cannot be said that his testimony rested upon hearsay evidence.

The examination of the medical examiner, both direct and cross, was voluminous and most of it dealt with and related to the autopsy which he had performed and the findings he arrived at as a result of it. In this posture of the case it would have been improper to grant the defendant's motion "that the doctor's testimony be stricken from the record and the jury instructed to disregard it."

We think the refusal of the trial court to strike the testimony was justified.

Even if an opposite conclusion were reached, the relief asked for could not be granted because the motion to strike was too broad. In *Beam v. Kent, 3 N. J.* 210 (1949), an

expert witness indicated that part of his testimony was based on certain plans and specifications provided by the manufacturer of machinery; the balance of it was the result of his own observation. A motion was made in that case to strike the entire testimony of the witness on the ground of hearsay and was denied by the trial court. We affirmed the judgment, holding that the objection was too broad and that, where it appeared a substantial portion of the evidence the witness gave was based on his own personal study and experience, a motion to strike any of it as hearsay would have to be particularized as to the part or parts objected to. In accord with this holding are *Leech v. H. & M. R. R. Co.,* 113 *N. J. L.* 366 (*Sup. Ct.* 1934), affirmed 115 *N. J. L.* 114 (*E. & A.* 1935), and *Rolfe v. Fingerhut,* 98 *N. J. L.* 894 (*E. & A.* 1923).

Finally, it is urged the trial court committed error in its charge to the jury defining second-degree murder because it said it was not necessary that the defendant intended to take the life or cause the death of the deceased to justify this verdict, as an attempt to do her grievous or serious bodily harm would be sufficient.

The defendant looks for support to *State v. DePaola,* 5 *N. J.* 1 (1950), a first-degree murder case, wherein we criticized the trial court's charge in so far as it instructed the jury: "The distinction between the two degrees of murder lies largely in the intent—in first degree murder the intent is to take life and the act must be willful, deliberate and premeditated. In second degree murder there is an attempt to do grievous bodily harm without the intent to take life." The distinction so drawn we held to be unsound. When a jury in a murder case retires to its deliberations under instructions that it can return a verdict of either first- or second-degree murder, it must be clearly instructed that the intent to kill is not by itself sufficient to raise second-degree murder to murder in the first degree; nor may the charge be susceptible of the interpretation that on a mere finding of such intent the jury must return a verdict of guilt in the greater degree. The requirement that all the elements

of the more serious crime be present must be made clear by the charge.

Murder in the second degree may include an intent to take life or an intent to do grievous bodily harm, so obviously the intent to take life is not the distinguishing feature; it may be present in both degrees.

In the case *sub judice,* the factual situation is different from that in the *DePaola* case. Here first-degree murder was eliminated by the State and the jury had been so advised by the judge. Murder in the second degree was the only conviction sought by the prosecution.

The court instructed the jury in the elements of murder in the second degree and of manslaughter as they related to the facts of the case and the evidence adduced. Murder in the second degree can rest upon the intent to inflict serious bodily harm.

The charge was correct and in accord with *State v. Moynihan,* 93 *N. J. L.* 253 (*E. & A.* 1919).

As we find no error in the record presented, the judgment below is affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—None.