47 N.J. Super. 1 (1957)
135 A.2d 191
HARRY ELEUTERI, ET ALS., PLAINTIFFS-APPELLANTS,
v.
GROVER C. RICHMAN, JR., ATTORNEY-GENERAL OF NEW JERSEY, AND MARTIN QUEENAN, BURLINGTON COUNTY PROSECUTOR, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 19, 1957.
Decided October 9, 1957.
*4 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. James M. Davis, Jr., argued the cause for plaintiffs-appellants (Messrs. Powell and Davis, attorneys).
Mr. David D. Furman, Deputy Attorney-General, argued the cause for defendants-respondents (Mr. Grover C. Richman, Jr., Attorney-General, and Mr. Harold J. Ashby, Deputy Attorney-General, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
Plaintiffs brought this action in the Chancery Division to obtain equitable relief against the defendants in respect of the prospective use against them, in the trial of pending indictments for bookmaking, of certain money and property obtained by the State as a result of assertedly illegal searches of their homes. From a summary judgment in favor of defendants, 43 N.J. Super. 303 (Ch. Div. 1956), plaintiffs bring this appeal.
At the argument of the motion for summary judgment leave was granted to plaintiffs to file, for the record, an amended complaint to cover certain factual contentions inadvertently omitted from the complaint, but included within the scope of the argument on the motion. In essence, the amended complaint sets forth the following grievances. As to the plaintiff Eleuteri it is charged that one George Dann, a trooper in the State Police, subordinate to and under the control of the defendant, Attorney-General Richman, on August 22, 1954 searched plaintiff's "premises" at 134 *5 Second Street in the City of Bordentown and took and carried away "papers, money and property" belonging to him, and that the search and seizure was illegal and unreasonable, in violation of specified provisions of the New Jersey and United States Constitutions in the respects: (a) that the only authorization for the search was a search warrant issued by the magistrate of the Municipal Court of the Township of Chesterfield, which was without jurisdiction in the City of Bordentown, and (b) that the warrant did not "particularly" describe the papers and things to be seized; that as a result of the said search the predecessor of the defendant, Prosecutor Queenan of Burlington County, procured an indictment of plaintiff, charging him with what is commonly known as bookmaking and possession of lottery policy slips, both constituting statutory criminal offenses, and that the said defendant holds the papers and property so seized for use at the trial of the plaintiff, being dependent thereon to establish a prima facie case against him; that both defendants are sworn to uphold the Constitutions both of New Jersey and of the United States; that the New Jersey courts of law, as distinguished from the courts of equity, have so construed Article I, paragraph 7, of the New Jersey Constitution of 1947, securing the people from unreasonable search and seizure, and its predecessor provision under the Constitution of 1844, as to deny the people the right to be "secure" in the sense intended by the Constitution of New Jersey and by the Fourth Amendment of the United States Constitution, the benefits of which extend to the citizen as against state action by virtue of the Fourteenth Amendment of the United States Constitution, particularly in that they have permitted papers and effects of citizens unauthorizedly searched and seized to be exposed to public view and used as evidence in the prosecution of such citizens for crime and have refused to suppress such papers and effects and return them to their owners notwithstanding that the search and seizure was illegal; that because of the "uniform and well established construction" of the Constitutions in the manner stated, the State of *6 New Jersey and its law enforcement officers, including the defendants, have "affirmatively sanctioned, practiced and encouraged" unlawful police incursion into the privacy of citizens and that defendants have "encouraged" their subordinates to take advantage of unconstitutional searches; that the search of plaintiff's home was "part and parcel" of that illegal policy of the State of New Jersey; and that the remedy afforded by the New Jersey law courts for illegal or unconstitutional searches is an action for damages, which is inadequate and will not compensate plaintiff for being convicted of crime as a result of evidence obtained in violation of his constitutional rights. Wherefore the complaint of the plaintiff Eleuteri sought judgment declaring the search illegal and the retention by defendants of the papers and effects seized to constitute a continuing unconstitutional seizure of his property; requiring defendants to return the property to the plaintiff or to deliver it to the court "for destruction"; and enjoining defendants from offering any of the effects in evidence at the trial of the indictments and from any further unconstitutional searches of plaintiff's premises, and any further "sanctioning in an affirmative way police incursion into the privacy of the plaintiff and the other citizens of the State of New Jersey."
As to the plaintiff Danley, the complaint follows the same pattern except that the premises searched in this case were situated at 52 East Main Street in the Village of Columbus, Township of Mansfield, and the illegality charged, in addition to the jurisdictional and other defects in the warrant asserted on behalf of plaintiff Eleuteri, includes the specification that the warrant authorized a search of number 54, rather than 52, East Main Street.
On the present appeal defendants do not argue, as they did below, their ground of motion that the defendant Richman may not be sued in his capacity as Attorney-General. Their basic position is relatively simple. Conceding that the search warrants were illegal, at least insofar as the issuing magistrate was without jurisdiction to issue a warrant for a search in a territorial area beyond that of his *7 municipal court, they contend that, stripped of its pretenses, the present action is designed solely to preclude the use against plaintiffs in their forthcoming criminal trials of the evidence discovered in the course of the searches, but that the decided cases of our courts have repeatedly held that, notwithstanding the illegality of a search, the evidence found is immune from any process to return it pending trial of a criminal charge wherein it is relevant and material per se upon the issue of defendants' guilt, and is receivable in evidence on that issue at the trial without regard to the illegality of the search. They argue that these rules of law constitute settled state policy, not to be circumvented by such an action as this; that plaintiffs' sole remedy is by civil action against the officers who have contravened the Constitution; and that the use by either defendant of the evidence in question in the pending prosecutions will not violate his oath of office. They deny any affirmative state policy for illegal searches and seizures. They further contend that settled principles of equity jurisprudence, particularly in respect of the enjoining of a criminal prosecution, preclude the grant of equitable relief.

I.
Before undertaking a consideration of the principal issues presented, two subsidiary questions require notice: (a) the adequacy of the legal remedies which the trial court held plaintiffs possessed; (b) whether the items of property are precluded from repossession by plaintiffs because contraband. To some extent these matters are related.
The trial court held that actions would lie either for replevin or for trespass against the officers who conducted the illegal search. The existence of a theoretical remedy for damages as for trespass is undeniable. See Fennemore v. Armstrong, 29 Del. 35, 96 A. 204 (Super. Ct. 1915); Simpson v. McCaffrey, 13 Ohio 508 (Sup. Ct. 1844); Gamble v. Keyes, 35 S.D. 644, 153 N.W. 888 (Sup. Ct. 1915); 79 C.J.S. Searches and Seizures § 101, p. 919; cf. Hebrew *8 v. Pulis, 73 N.J.L. 621, 625 (E. & A. 1906). But the availability of such an action, apart from the matter of the unlikelihood of substantial damages in such a case as this, particularly if the plaintiffs are convicted of gambling, begs the question which this action poses, i.e., the alleged right of plaintiffs to have specific enforcement of the security against illegal searches vouchsafed them by the constitutional provisions in the form of a judgment ordering a return of the property in order to prevent defendants from effecting what plaintiffs conceive is a continuing breach of those provisions through the holding and prospective use of the property to convict plaintiffs of a crime. If plaintiffs' constitutional grievances are as broad as they claim and if nothing short of a grant of their prayer for relief will vindicate them, a judgment for damages will not adequately compensate them.
As to replevin, the availability of an action of that nature is far from clear. The record before us does not reveal the precise character of the property seized. But if, as may be inferred, it was gambling paraphernalia or property used in the furtherance of gambling, the statute forbids its deliverance out of the hands of the authorities pending the outcome of criminal proceedings. N.J.S. 2A:152-6, 7; Spagnuolo v. Bonnet, 16 N.J. 546, 558 (1954). Even if it was not contraband, there is authority to the effect that property held by the State as evidence for use in a criminal trial is not subject to replevin or to an action of that purport or effect. 46 Am. Jur., Replevin, § 46, p. 30. The question, however, frequently is confused with the meritorious issue before us here, i.e., the effect of the fact that the property was obtained from the owner-suspect by an unconstitutional search and seizure upon its admissibility in evidence in criminal proceedings. Ibidem. We conceive that the interests of substantial justice and of an expeditious determination of this controversy call for our consideration of the matter before us on the merits of the important constitutional questions raised rather than to permit procedural incidents to divert us from that course. *9 N.J. Const. (1947), Art. VI, Sec. III, par. 4; O'Neill v. Vreeland, 6 N.J. 158 (1951); Tumarkin v. Friedman, 17 N.J. Super. 20 (App. Div. 1951), certification denied 9 N.J. 287 (1952).

II.
Although it is obvious from plaintiffs' argument that they have instituted this action in the Chancery Division in the belief that a more hospitable forum would there be found for the plea that restitution of the papers and property seized is an inseparable incident of their right to be secure against unreasonable search and seizure, and that retention of the papers and property by defendants is violative of their obligation to uphold the Federal and State Constitutions, we conceive that plaintiffs' real and underlying contention is that the rules heretofore applied by our criminal courts concerning the right of the State to retain and use in a prosecution of its owner any property evidential of his guilt, notwithstanding its discovery and seizure as the result of an unconstitutional search and seizure, should now be reexamined and repudiated. The precise position taken appears to concede that, as a technical rule of evidence, once trial of an indictment is under way, the questionable data is admissible regardless of the illegality of its procurement, but that it ought to be possible to forestall this result by suitable proceedings in advance of trial to suppress the data. This would eliminate the objection of delaying the trial by introduction of a collateral issue and yet restore the victim of the illegal search to his security-status with respect to the data as of prior to the search. Plaintiffs conceive that unless they can have this relief at the hands of some tribunal, they have been denied the essence of the security from unreasonable search guaranteed them by Article I, paragraph 7 of the New Jersey Constitution, and by the Fourth Amendment of the United States Constitution, made applicable to state action by the Fourteenth Amendment.
As an intermediate appellate tribunal we are first faced with the question as to whether these inquiries have not *10 been resolved by the courts of last resort of this State and therefore concluded as far as this court is concerned. With respect to the evidence rule there is no doubt that the matter was settled long ago by the Court of Errors and Appeals adversely to the plaintiffs' position. State v. Lyons, 99 N.J.L. 301 (E. & A. 1923); State v. Merra, 103 N.J.L. 361 (E. & A. 1927); State v. Cortese, 104 N.J.L. 447 (E. & A. 1927), affirming 4 N.J. Misc. 683 (Sup. Ct. 1926); State v. Guida, 119 N.J.L. 464 (E. & A. 1938), affirming 118 N.J.L. 289 (Sup. Ct. 1937). If evidential per se, i.e., if "material and competent" when "we leave out of consideration the manner in which the State obtained the papers," they are admissible in evidence. See State v. Pinsky, 6 N.J. Super. 90, 94 (App. Div. 1950). A number of former Supreme Court decisions are in accord. And it hardly matters now that most of these cases rely upon State v. MacQueen, 69 N.J.L. 522, at page 528 (Sup. Ct. 1903), which expressly refused to decide the question because it had not been raised below. Neither the Court of Errors and Appeals nor the present Supreme Court, however, has ever passed directly on the question as to whether illegally procured evidence is required to be returned to its owner upon demand in advance of a criminal trial. Our former court of last resort had two opportunities to do so, the question having been raised in State v. Mausert, 88 N.J.L. 286 (E. & A. 1915), and in State v. Giberson, 99 N.J.L. 85 (E. & A. 1923). In both instances the court preferred to remain silent, the Mausert case going off on a holding that the seizure was the incident of a lawful arrest and the Giberson ruling being predicated upon consent to the search by the defendant. A strongly stated dictum in support of the right to pretrial return of such property was uttered by the Middlesex Court of Oyer and Terminer in State v. Condon, 40 N.J.L.J. 293 (1917). The former Supreme Court, however, has held that a motion to return illegally seized evidence would be unavailing, the decision relying upon the cases on admissibility of the evidence at trial. State v. First Criminal Judicial Dist. Court, Bergen *11 Co., 10 N.J. Misc. 715, 160 A. 672 (Sup. Ct. 1932). The point was given extended consideration in the former Essex County Court of Quarter Sessions in State v. Black, 5 N.J. Misc. 48, 55, 135 A. 685 (1926), where it was concluded that a pretrial motion for the return of illegally seized evidence would "conflict" with the cases rejecting the exclusionary rule and that the practice was unauthorized.
The same question reappeared in In re 301-317 Clinton Avenue, 35 N.J. Super. 136 (Cty. Ct. 1955). There a search warrant which had been executed by a state trooper acting as an agent of the Law Enforcement Council, resulting in the seizure of property contended by the State to have been used in the conduct of a lottery, was sought to be quashed on a motion before trial of a criminal prosecution on the ground, among others, that while assigned to the Law Enforcement Council the trooper was under a disability to execute a search warrant. The County Court agreed the warrant was illegally executed but denied the motion to quash on the authority of State v. Black, supra, relying also upon State v. Cicenia, 6 N.J. 296 (1951), where it was held that the criminal procedure rules did not authorize a motion in advance of trial to suppress a confession. When the case reached the Supreme Court, sub nomine Application of Berlin, 19 N.J. 522, at page 531 (1955), it was held that the execution of the warrant and all other attendant incidents of the search and seizure were legally unexceptionable, and the court then stated, significantly:
"In this view it is unnecessary to determine the asserted right to a return of the goods taken where the search warrant is quashed for invalidity."
Since the point referred to could have been dispatched by a reference to the earlier authorities holding against the right of return of the goods, we are of the view that the foregoing disposition constitutes a pointed indication by our highest court that the question as to the right to a *12 pretrial return of unconstitutionally seized property (or to suppression as evidence if the property is contraband) is open for adjudication. That assumption is nourished by the fact that in the course of the Berlin opinion (19 N.J. at page 527) the court cites State v. Alexander, 7 N.J. 585 at pages 593-595 (1951), which, by thoroughly considered dictum, reaffirms the non-exclusionary rule (7 N.J. at pages 593-595). (See the discussion of the Alexander case, infra.) See also State v. Pinsky, supra.
An approach to the question left open in Application of Berlin can be logically undertaken from two points of view: first, by an examination of the wisdom and justification for a procedural rule which would permit an application by the victim of an illegal search to have his property returned if made prior to trial, but otherwise adhering to the present rule of admissibility (which, with some qualifications, is the federal rule; Fed. R. of Crim. Proced. 41 (e), 18 U.S.C.A.); second, by a new appraisal of the merits of the exclusionary rule. It is, however, difficult to exclude reflection upon the merits of that rule in deliberation over the adoption of the pretrial motion technique, since the policy of exclusion is necessarily implicated, at least indirectly, even in that procedural device. Moreover, the state courts have been practically invited by the United States Supreme Court, since the rendition of the opinion in the Alexander case, to reconsider the doctrine of non-exclusion in the light of the consideration that in Wolf v. Colorado, 338 U.S. 25, at page 27, 69 S.Ct. 1359, at page 1361, 93 L.Ed. 1782 (1949), that court held, for the first time, that the "security of one's privacy against arbitrary intrusion by the police" is embodied in the concept of due process found in the Fourteenth Amendment, but that, nevertheless, it was for the states to decide for themselves whether the vindication of the right required the rule of exclusion of illegally secured evidence at a criminal trial, a rule which the federal courts deem necessary for that purpose in federal prosecutions. Irvine v. California, 347 U.S. 128, 134, 74 S.Ct. 381, 98 L.Ed. 561 (1953).
*13 The underlying problem seems to us to grow out of the commonly encountered phenomenon in social psychology that basic rights for the protection of individuals from governmental abuse erected in a distant age when the evil was present and grievous tend to depreciate in the community value-judgment at a later time when the evil slumbers and asylum within the protective rule is most frequently sought by criminals.
The Fourth Amendment of the United States Constitution states:
"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis supplied.)
This, as well as the other of the first ten amendments, was adopted at the outset of our federal system as a restriction of the Federal Government against abuse of the individual. A practically identical provision was incorporated in the New Jersey Constitution of 1844, Article I, paragraph 6, and readopted in the Constitution of 1947, Article I, paragraph 7.
The inclusion of the Fourth Amendment in the federal Bill of Rights was a direct response to the invasion and ransacking of private homes under governmental authority both in England and in the Colonies. In the mother country the hateful instrumentality was the general warrant, designed principally to uncover evidence of criminal political libel, Entick v. Carrington (1765), 19 Howell's State Trials 1029. In the Colonies the stimulus was the writs of assistance under which Crown customs officers invaded private homes for the purpose, real or pretended, of searching for smuggled goods. See Boyd v. United States, 116 U.S. 616, 625-627, 6 S.Ct. 524, 29 L.Ed. 746 (1886); 1 Cooley's Constitutional Limitations (8th ed. 1927), p. 610 et seq.; Harno, "Evidence Obtained by Illegal Search and Seizure," 19 Ill. L. Rev. 303, 304-305 (1925); Rudd, "Present Significance *14 of Constitutional Guaranties against Unreasonable Searches and Seizures," 18 U. of Cinc. L. Rev. 387, 391 (1949). There is no lack of judicial language recognizing this right as one of the most basic constitutional protections of the individual against government. It has been described as being "of the very essence of constitutional liberty," Gouled v. United States, 255 U.S. 298, 304, 41 S.Ct. 261, 65 L.Ed. 647 (1921). The deliverance by Mr. Justice Frankfurter in Wolf v. Colorado, supra, though refusing to embrace the exclusionary rule as an essential of due process, nevertheless said (338 U.S. at pages 27, 28, 69 S.Ct. at page 1361):
"The security of one's privacy against arbitrary intrusion by the police  which is at the core of the Fourth Amendment  is basic to a free society. It is therefore implicit in `the concept of ordered liberty' and as such enforceable against the States through the Due Process Clause. The knock at the door, whether by day or by night, as a prelude to a search, without authority of law but solely on the authority of the police, did not need the commentary of recent history to be condemned as inconsistent with the conception of human rights enshrined in the history and the basic constitutional documents of English-speaking peoples."
Dissenting in Harris v. United States, 331 U.S. 145, 163, 67 S.Ct. 1098, 1104, 91 L.Ed. 1399 (1947), the same jurist described the Fourth Amendment as taking "a place second to none in the Bill of Rights" and to be "central to enjoyment of the other guarantees."
In the light of these expressions and the background and language of the constitutional provisions, it is difficult to repel the natural logic of the idea that restoration to the owner of that which was unconstitutionally taken from him by the authorities is of the very fabric of the security from unreasonable search and seizure ostensibly given him by the Constitutions. Granted that the unlawful breach of his privacy is complete when perpetrated, and, in that sense, irreparable, the restoration to him of property that was in his private possession and security until the illegal act wrested it from him is at least a partial restoration of his status quo ante. If it be said that when the seizure *15 discloses evidence of the commission of crime it evokes the concomitant need for retention of the property as evidence to vindicate society's interest in punishment of the crime, the obvious answer is that the very philosophy underlying the formulation and adoption of the protection in the first place envisaged that it would shelter those despoiled of privacy in the name of law enforcement (smuggling, sedition, criminal libel, etc.). To justify retention of the fruits of the illegal search by the post facto demonstration of criminality in a particular case is, therefore, not only to blink at the logic of history, but also necessarily to corrode the right in the hands of an innocent; for he may be the victim of suspicion, real or fancied, which the police will be tempted to investigate by illegal search, when it is inconvenient or impossible to comply with the Constitution, if they know that the fortuitous discovery of evidence of crime thereby will automatically validate its retention and use against the subject. A fruitless violation leaves the innocent victim to the sorry remedy of an action for damages. See Irvine v. California, supra (347 U.S. at page 137, 74 S.Ct. at page 385). As was stated for the Supreme Court in McDonald v. United States, 335 U.S. 451, 453, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948), ordering the suppression of evidence illegally taken from a professional gambler:
"This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike,"
and, 335 U.S. at page 455, 69 S.Ct. at page 193:
"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law."
That a degree of shelter of the guilty is an inescapable consequence if the constitutional safeguard is to have any *16 effectiveness as a protection of all the citizenry, has been repeatedly recognized. Trupiano v. United States, 334 U.S. 699, 710, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); Go-Bart Importing Co. v. U.S., 282 U.S. 344, 357, 51 S.Ct. 153, 75 L.Ed. 374 (1931); Byars v. U.S., 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927).
In Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the Supreme Court was for the first time confronted with the question as to whether a pretrial demand by a person charged with crime for the return of unconstitutionally seized property was required to be honored as an incident of his rights under the Fourth Amendment. The decision was in the affirmative, the court declaring that otherwise the Fourth Amendment "is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution" (232 U.S. at page 393, 34 S.Ct. at page 344). Cf. Adams v. New York, 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904), affirming People v. Adams, 176 N.Y. 351, 68 N.E. 636, 63 L.R.A. 406 (Ct. App. 1903), which was distinguished in the Weeks case on the ground that in Adams there was no objection by defendant to the manner in which the evidence was secured until trial. The Weeks decision was foreshadowed in Boyd v. United States, supra, sustaining the principle of exclusion, but there actually applied to a situation more assimilable to the protections of the Fifth Amendment. After Weeks and until the ambivalent opinion of the court majority in Wolf v. Colorado, supra, the attitude of the court continued to be that the Fourth Amendment was in essence "a provision forbidding the acquisition of evidence in a certain way," Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Whereas in the Weeks case the court found that the refusal of restitution of the illegally seized property constituted "a denial of the constitutional rights of the accused" (232 U.S. at page 398, 34 S.Ct. at page 346), there was hesitation "to treat this remedy [exclusion of evidence] as an essential ingredient of the right," when, 35 years later, in the Wolf *17 case, supra, the court was asked to compel the states to apply the exclusionary rule as a matter of due process (338 U.S. at page 29, 69 S.Ct. at page 1362). See Frank, "Review and Basic Liberties," in Supreme Court and Supreme Law (Cahn ed. 1954), pp. 109, 139; Comment: 35 Cornell L.Q. 625 (1950); Allen, "The Wolf Case: Search and Seizure, Federalism, and the Civil Liberties," 45 Ill. L. Rev. 1 (1950).
Thus, while the United States Supreme Court will not compel them to do it (but see Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)), the courts of the several states are left to determine independently whether history, language and reason do not show that the Fourteenth Amendment and their own constitutional provisions require the suppression as evidence of illegally secured property, no matter how incriminating.
A recent tabulation of the judicial jurisdictions shows that 25 states (including New Jersey), England and Canada follow the so-called common-law rule of admission, and generally without regard to the making of a pretrial motion for suppression, while 21 states and the District of Columbia apply the exclusionary rule. Annotation 50 A.L.R.2d 531, 535-536 (1956). It may be of significance that since the decision in the Wolf case the trend has been toward the exclusionary rule, two states switching their positions in that direction by legislation, 1C North Carolina Gen. Stat., §§ 15-27; 2 Texas Code of Crim. Proc., Art. 727a, and two others by judicial decision, Rickards v. State, 45 Del. 573, 77 A.2d 199 (Sup. Ct. 1950); People v. Cahan, 44 Cal.2d 434, 282 P.2d 905, 50 A.L.R.2d 513 (Sup. Ct. 1955). Rhode Island, previously uncommitted, has by statute adopted the rule of exclusion. Acts and Resolves, 1955, c. 3590, § 16, p. 565. See Note, 30 St. John's L. Rev. 236, 247 (1956); cf. Cowen, "The Admission of Evidence Procured Through Illegal Searches and Seizures in British Commonwealth Jurisdictions," 5 Vand. L. Rev. 523 (1952).
Learned debate of the merits of the question, though profuse, is more often attuned to considerations relating to *18 consequences of the alternative rules upon law enforcement than upon the effectuation of the civil liberties involved. Bibliographical collections pro and con are to be found in Comment, "Judicial Control of Illegal Search and Seizure," 58 Yale L.J. 144, 151, n. 32 (1948), and Note, 56 Col. L. Rev. 940, 941, n. 13 (1956), as well as in other papers cited elsewhere in this opinion. No adequate empirical studies have been made to afford a reliable answer to the question as to whether one alternative rather than the other leads to better observance of the constitutional guaranties, or, for that matter, to more effective law enforcement. See Comment, "Search and Seizure in Illinois: Enforcement of the Constitutional Right of Privacy," 47 N.W.U.L. Rev. 493 (1952); Allen, op. cit., supra (45 Ill. L. Rev., at 16-17); Barrett, "Exclusion of Evidence Obtained by Illegal Searches  Comment on People v. Cahan," 43 Cal. L. Rev. 565, 583-592 (1955); Mr. Justice Murphy, dissenting, in Wolf v. Colorado, supra (338 U.S. at pages 44-46, 69 S.Ct. at pages 1370-1371).
As to the practical uselessness of such sanctions against illegal searches as the civil actions for damages or theoretical criminal liability of the offending officer there is no responsible dissent. See Comment, 58 Yale L.J., supra, at p. 151. But see Blumrosen, "Contempt of Court and Unlawful Police Action," 11 Rutgers L. Rev. 526 (1957). Notwithstanding this truism, the most frequently stated argument against the exclusionary rule is the indictment that the rule lets go free both the law-breaking official and the criminal he subjects to illegal search and seizure. See 8 Wigmore on Evidence (3d ed., 1940), § 2184, p. 40; Cardozo, J., in People v. Defore, 242 N.Y. 13, 150 N.E. 585 (Ct. App. 1926). In the latter ruling, impelled primarily by the earlier decision in People v. Adams, supra, the issue is posed (150 N.E. at page 589): "The question is whether protection for the individual would not be gained at a disproportionate loss of protection for society. On the one side is the social need that crime shall be repressed. On the other, the social need that law shall not be flouted *19 by the insolence of office." Though felicitously phrased, this hardly assays the weight in the balance of the constitutional protection involved. It is not merely a need to repress insolent officials but effectively to vindicate a basic freedom. The decision to accommodate methods for catching criminals to a reasonable degree of security for the privacy of the individual was made by the constitutional framers, and it ought to control those vested with the responsibility of upholding that decision while it remains the law of the land, whatever their private misgivings as to its merits. We have already shown that the fact that rigorous enforcement of the Constitution means some impairment of the sanctions for criminal law observance is implicit in the policy-judgment represented by the very adoption of the constitutional provision. Therefore, to give it lukewarm enforcement because of fear of the effect of rigorous enforcement upon the general repression of crime seems indefensible. The logic of the exclusionary rule was expressed by Judge Learned Hand in Connolly v. Medalie, 58 F.2d 629, 630 (2 Cir. 1932):
"The power to suppress the use of evidence unlawfully obtained is a corollary of the power to regain it. The prosecution is forbidden to profit by a wrong whose remedies are inadequate for the injury, unless they include protection against any use of the property seized as a means to conviction."
The validity of this philosophy led a majority of the California Supreme Court in the Cahan case, supra, recently to deliberately turn about and adopt the exclusionary rule, finding that "other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers" (282 P.2d at page 911). In the same general tenor are the discussions in Comment, 58 Yale L.J., supra, at p. 152; Allen, op. cit., supra (45 Ill. L. Rev., at p. 17); Chafee, "The Progress of the Law," 35 Harv. L. Rev. 673, 694 (1922); Carroll, "The Search and Seizure Provisions of the Federal and State Constitutions," 10 Va. L. Rev. 124 (1923); Rudd, op. cit., supra; *20 Atkinson, "Admissibility of Evidence Obtained Through Unreasonable Searches and Seizures," 25 Col. L. Rev. 11, 24 (1925); Hall, "Police and Law in a Democratic Society," 28 Ind. L.J. 133, 172-175 (1953).
Adherence to the rule of admissibility has led many to question "the extent to which justice under law is accepted as a guide to conduct" in criminal administration, 291 Annals of The American Academy of Political and Social Science, 1, 3 (1954); American Bar Foundation, The Administration of Criminal Justice in the United States, Plan for Survey (1955), pp. 124-5. Mr. Justice Brandeis in his dissenting opinion in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (concerning the use of evidence procured through wiretapping), stated that:
"If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means  to declare that the government may commit crimes in order to secure the conviction of a private criminal  would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."
In the same case, Mr. Justice Holmes expressed the view that (277 U.S. at p. 470, 48 S.Ct. at page 575):
"It is desirable that criminals should be detected, and to that end all available evidence should be used. It also is desirable that the government should not itself foster and pay for other crimes, when they are the means by which the evidence is to be obtained. * * * We have to choose, and for my part I think it a less evil that some criminals should escape than that the government should play an ignoble part."
The common aphorism that the exclusionary rule means both the law-breaking officer and the law-breaking suspect escape cannot withstand analysis. Of course, the rule has nothing to do with the practical impunity of the officer guilty of unreasonable search and seizure. That remains a cold fact, whatever the rule as to return or exclusion *21 of evidence. The absolutism in the other half of the cliche has hardly more to commend it. There are few situations where the apprehension of a criminal suspect is prevented by adherence to the Constitution by the police. It is settled that search warrants are required only where "reasonably practicable," see Trupiano v. United States, supra (334 U.S. at page 705, 68 S.Ct. at page 1232), not, for example, where the place to be searched is a vehicle which can easily get away, Carroll v. United States, 267 U.S. 132, 156, 45 S.Ct. 280, 69 L.Ed. 543 (1924). A warrant will issue when there are "reasonable grounds for suspicion, supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the accused is guilty of the offense with which he is charged." Application of Berlin, supra (19 N.J. at page 527). Moreover, it is only "unreasonable" searches that the Constitutions prohibit. There is always a right of search and seizure by the police without a warrant when incidental to a lawful arrest. State v. Mausert, supra; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Moreover, the right of search incidental to a valid arrest of an individual includes not only his person but the premises under his control "in order to find and seize things connected with the crime as its fruits or as the means by which it was committed." (Ibid., 339 U.S. at page 61, 70 S.Ct. at page 433.) "Some flexibility will be accorded law officers engaged in daily battle with criminals for whose restraints criminal laws are essential." (Ibid., 339 U.S. at page 65, 70 S.Ct. at page 435). See also Application of Berlin, supra (19 N.J. at page 527); Lane v. Pennsylvania R. Co., 78 N.J.L. 672, 674 (E. & A. 1910). In view of this practical approach to the law enforcement problem by the court which is the most authoritative exponent of the view that preservation of the Fourth Amendment requires suppression of evidence obtained in violation of its provisions, can it fairly be said that the upholding of that view is to be equated with a crippling of law enforcement? At least to such a degree *22 as to warrant the continued practical emasculation of so vital a bulwark of constitutional liberty of the individual? It may be significant that the Federal Bureau of Investigation has not found the exclusionary rule incompatible with good law enforcement.
The Supreme Court of the United States has in a series of recent cases given practical demonstration of the discharge of the most fundamental duty of the judiciary  the solicitous preservation of the historic protections of the individual embedded in the Bill of Rights  notwithstanding strong dissent from a substantial segment of public opinion. Slochower v. Board of Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Sweezy v. New Hampshire, 352 U.S. 812, 77 S.Ct. 49 (1957); Watkins v. United States, 352 U.S. 822, 77 S.Ct. 62, 1 L.Ed.2d 46 (1957); Yates v. Washington, 352 U.S. 896, 77 S.Ct. 135, 1 L.Ed.2d 88 (1957); Mallory v. United States, 352 U.S. 877, 77 S.Ct. 103, 1 L.Ed.2d 79 (1957); Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Our State Supreme Court has been equally vigilant a guardian of the constitutional rights of the individual against governmental authority, no matter how unpopular his views or demeaning his record. See Laba v. Newark Board of Education, 23 N.J. 364, 377, 378 (1957); Imbrie v. Marsh, 3 N.J. 578 (1950); State v. Midgley, 15 N.J. 574 (1954). In the last case (15 N.J. at page 579) Mr. Justice Brennan repeated the language of Mr. Justice Heher in State v. DiGiosia, 3 N.J. 413, 421 (1950), referring to an argument against recognizing a plea of autrefois acquit because the defendant would escape just punishment: "Such occasional failures of justice are outweighed by the general personal security afforded by the great principle of freedom from double jeopardy. Such misadventures are the price of individual protection against arbitrary power." At the outset of his opinion in State v. Orecchio, 16 N.J. 125, 129 (1954), Mr. Justice Jacobs reflected the present day hegemony of constitutional rights over punishment for crime in our jurisprudential philosophy:
*23 "The sound administration of criminal justice in our democracy requires that both the end and the means shall be just. The accused, no matter how abhorrent the offense charged nor how seemingly evident the guilt, is entitled to a fair trial surrounded by the substantive and procedural safeguards which have stood for centuries as bulwarks of liberty in English speaking countries."

III.
It is the considered view of this bench that for the reasons set forth above both the vindication in a particular case of the constitutional rights of the subject of the illegal search and the prospective protection of the right of privacy of citizens, generally, require the sanction of suppression as evidence of property seized in violation of the constitutional guaranties. There should, moreover, be no differentiation based upon the degree of the violation, if violation there be. See Boyd v. United States, supra (116 U.S. at page 635, 6 S.Ct. at page 534). But considerations of appropriateness compel us to defer to our highest court for a first instance judicial determination of the question left open in Application of Berlin, supra.
Two factors control our attitude. First, in State v. Alexander, supra, the court was firm in its declaration, albeit dictum, that it had reconsidered the subject but remained unconvinced that the rule of admissibility should be abandoned (7 N.J. at page 595). While the court was not there specifically concerned with the practice of moving for suppression in advance of trial  the question passed by the court in Application of Berlin  the problems are intimately interrelated. Cf. Greenspan v. Slate, 22 N.J. Super. 344, 351 (App. Div. 1952); Rafferzeder v. Raleigh, etc. Memorial Hospital, 33 N.J. Super. 19, 23 (App. Div. 1954). Second, an attempt was made to change this rule by an express constitutional provision at the time of the adoption of the 1947 Constitution, I Convention Proceedings, Record, pp. 63, 598-608; II, Ibid, pp. 1041-2, but the effort was unsuccessful. While this may have reflected the opinion that implementation of the search and seizure provision should be left to the Legislature or the courts, I, op. *24 cit., supra, at pp. 603, 606, the result fortifies the view that any change of rule in the present case should be made by the Supreme Court rather than this tribunal.
If the ultimate decision is for suppression of illegally obtained evidence, however, nothing said in State v. Cicenia, supra, should bar the way against its procedural implementation. In its passing reference to Rule 41 of the Federal Rules of Criminal Procedure the court was clearly assuming the continued subsistence of a substantive right on the part of the State to use against the criminal defendant the evidence unlawfully taken from him (6 N.J. at pages 301, 302). "A rule of practice must not be allowed for any technical reason to prevail over a constitutional right," Gouled v. United States, supra (255 U.S. at page 313, 41 S.Ct. at page 266). A rule of practice can readily be promulgated to conform the procedure with the Constitution, as interpreted.

IV.
If it is the law of this State that a defendant in a criminal prosecution has no right to an order from the court of criminal jurisdiction returning or suppressing as evidence property unconstitutionally taken from him  and we have decided not to hold otherwise in this case  it remains the duty of the defendant law enforcement officers to hold and present the evidence when the case comes to trial. True, as argued by plaintiffs, it is defendants' sworn duty to uphold both State and Federal Constitutions. Any participation, direct or indirect, on their part, in the constitutional transgression here involved would have been a violation of their respective oaths of office. (There is no charge here that there was such participation.) But the present status of the matter is that they are preparing to perform their duty to present evidence of crime in a pending prosecution. That, too, is their constitutional duty. If the case law of this State is to the effect that they cannot be diverted from that course by reason of the taint attending the procurement *25 of the evidence, a contrary result cannot be accomplished in the name of enforcement of their oaths of office. There are appropriate sanctions for a violation of an oath of office. This action is not one of them.

V.
The allegations in the amended complaint concerning affirmative sanction, practice and encouragement by the State of New Jersey and its officers, including defendants, of unconstitutional searches and seizures, are designed to bring the case within the statement in the opinion of the court in Wolf v. Colorado, supra, "that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment" (338 U.S. at page 28, 69 S.Ct. at page 1361). Neither the complaint nor anything said on behalf of the plaintiffs in the argument supports the thought that their contention is anything more than that the case rule against suppression or exclusion of illegally secured evidence tends to encourage violation of the constitutional guarantee. This is not an affirmative sanction by the State of illegal searches and seizures. There is no suggestion of any concerted, planned or general program by the state law enforcement authorities for disregard of the constitutional requirements for search and seizure. We do not find a grievance grounded in the Wolf exception properly invoked by the complaint in this case, because we perceive no genuine factual allegations in the complaint warranting its entertainment, nor do we apprehend that any would be forthcoming were the complaint again amended. Cf. Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244 (App. Div. 1957).

VI.
Since the approach taken by the court in this case has turned on the merits of the claim of constitutional infringement, there is no occasion to consider the authorities *26 cited by plaintiffs supporting the concept of equitable jurisdiction to protect the right of privacy. See Vanderbilt v. Mitchell, 72 N.J. Eq. 910 (E. & A. 1907); Brex v. Smith, 104 N.J. Eq. 386 (Ch. 1929); McGovern v. Van Riper, 137 N.J. Eq. 24 (Ch. 1945), affirmed 137 N.J. Eq. 548 (E. & A. 1946). Our decision, technically, sustains the right of the defendants to pursue the course upon which they were embarked when the complaint was filed. As that constituted the furtherance of a criminal prosecution, there comes into play the settled rule that equity will ordinarily refrain from enjoining a criminal prosecution. 4 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 1347, p. 949; Moresh v. O'Regan, 122 N.J. Eq. 388 (E. & A. 1937); cf. Bantam Books, Inc. v. Melko, 25 N.J. Super. 292 (Ch. 1953), modified 14 N.J. 524 (1954).
Judgment affirmed.